1 | Rabin J. Pournazarian (SBN 186735)
**Price Law Group, APC**
2 | 15760 Ventura Blvd., Suite 1100
Encino, CA  91436
3 | (818) 995-4540 Telephone
(818) 995-9277 Fax
4 |
Attorneys for Debtors,
5 | Andrew & Martha Lombardo

6 |            UNITED STATES BANKRUPTCY COURT

7 |      CENTRAL DISTRICT OF CALIFORNIA, SANTA ANA DIVISION

8 |

9 | In re:                        Case No: ƒ:09-23461-RK

10 |                               Chapter 13

11 |                               NOTICE OF MOTION AND MOTION FOR
                                  ORDERS DETERMINING VALUE OF
12 |                              REAL PROPERTY, EXTENT OF
                                  SECURED CLAIMS AND
13 | ANDREW & MARTHA LOMBARDO,     EXTINGUISHING THE SECOND LIEN
                                  OF AMERICAN MORTGAGE NETWORK,
14 |                              INC.(SERVICED BY BANCO POPULAR
                                  NORTH AMERICA); MEMORANDUM OF
15 |                              POINTS AND AUTHORITIES;
                                  DECLARATIONS IN SUPPORT
16 |

17 |              Debtors.         Hearing Information
                                  Date: February 10, 2010
18 |                              Time: 2:30 p.m.
                                  Place: United States Bankruptcy
19 |                                     Court – Central District
                                         of California
20 |                                     411 West Fourth Street,
                                         Suite 5165 Crtrm:5D
21 |                                     Santa Ana, CA 92701

22 |

23 |

24 |
         TO THE HONORABLE ROBERT KWAN, UNITED STATES BANKRUPTCY JUDGE;
25 |
CREDITOR AMERICAN MORTGAGE NETWORK, INC. & BANCO POPULAR NORTH
26 |
AMERICA; CHAPTER 13 TRUSTEE, AMRANE COHEN; AND ALL OTHER INTERESTED
27 |
PARTIES:
28 |

**PLEASE TAKE NOTICE** that debtors Andrew & Martha Lombardo move the Court for orders:

1.      Determining that the value of that certain real property commonly known as 2541 Stanton Avenue, La Habra, CA 90631 (the "Real Property") was $286,000.00 as of the date of filing;

2.      Determining that the secured claim of Andrew & Martha Lombardo's (hereinafter "Debtors") first mortgage with American Mortgage Network, Inc. (hereinafter "American 1"), which is serviced by IndyMac Mortgage Services (hereinafter "IndyMac") is senior to that of Debtors' second mortgage with American Mortgage Network, Inc. (hereinafter "American 2"), which is serviced by Banco Popular North America (hereinafter "Banco") with respect to the Real Property.   In addition, determining that the amount of American 1's first secured claim (serviced by IndyMac) exceeds the value of the Real Property;

3.      Determining that American 2's second mortgage claim (serviced by Banco) is wholly unsecured; and

4.      Finding that modification of  American 2's mortgage claim (serviced by Banco) is therefore appropriate under 11 U.S.C. §1322(b)(2); that the second mortgage lien of American 2 (serviced by Banco) is extinguished; and that American 2 (serviced by Banco) may be provided for as an unsecured claim in the debtors' Chapter 13 plan.

**DEADLINE FOR OPPOSITION PAPERS:**

1    Please taken further notice that Local Bankruptcy Rule 9013-

2  1(a)(7) provides:

3    "Opposition/Joinders/Responses to Motions. Except as set

4    forth in Local Bankruptcy Rule 9013-1(e) with regard to

5    motions for summary judgment or partial summary

6    adjudication, or unless otherwise ordered by the court,

7    each interested party opposing, joining, or responding to

8    the motion shall file and serve not later than 14 days

9    before the date designated for hearing either:

10    (A) A brief but complete written statement of all reasons

11    in opposition thereto or in support or joinder thereof, and

12    answering memorandum of points and authorities,

13    declarations and copies of all photographs and documentary

14    evidence on which the responding party intends to rely. The

15    opposing papers shall advise the adverse party that any

16    reply to the opposition shall be filed with the court and

17    served on the opposing party not later than 7 calendar days

18    (not excluding Saturdays, Sundays, and legal holidays)

19    prior to the hearing on the motion; or

20    (B) A written statement that the motion will not be opposed.

21    Local Bankruptcy Rule 9013-1(a)(11) provides:

22    "Failure to File Required Papers. Papers not timely filed

23    and served may be deemed by the court to be consent to the

24    granting or denial of the motion, as the case may be."

25

26

27

28

1    **Wherefore**, Debtors request that the Court find that the second

2  mortgage lien of American 2 (serviced by Banco) is wholly unsecured

3  and that the lien be extinguished.

4

5  DATED: January 4, 2010              Price Law Group, APC

6

7                                      By:  _____

8                                           Rabin A. Pournazarian
                                            Attorneys for Debtors

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

### MEMORANDUM OF POINTS AND AUTHORITIES

2

### I.

3

### BACKGROUND FACTS

4      Debtors Andrew & Martha Lombardo ("Debtors") filed this Chapter

5 13 case on December 2, 2009.  Debtors owned and resided at 2541

6 Stanton Avenue, La Habra, CA 90631 (the "Real Property"). See **Exhibit**

7 **"A."**  On the date of filing, the first deed of trust encumbered the

8 Real Property in favor of American Mortgage Network, Inc.

9 (hereinafter "American 1").  See **Exhibit "B."**  The servicing agent of

10 the loan is IndyMac Mortgage Services (hereinafter "IndyMac), which

11 is owed a balance of approximately $385,000.  See **Exhibit "C."**  A

12 second deed of trust encumbered the Real Property also in favor of

13 American Mortgage Network, Inc. (hereinafter "American 2").  See

14 **Exhibit "D."**  The current servicing agent of the loan is Banco

15 Popular North America (hereinafter "Banco"), which is owed a balance

16 of approximately $109,863.36.  See **Exhibit "E."**  According to a full

17 appraisal report, the Real Property had a value of $286,000.  See

18 **Exhibit "F."**

19                                    II.

20                              AUTHORITIES

21      **AN APPRAISAL SHOWS THAT THE VALUE OF THE REAL PROPERTY WAS**

22      **$286,000 AS OF THE FILING DATE.**

23      Pursuant to Rule 3012 of the Federal Rules of Bankruptcy

24 Procedure (hereinafter "FRBP"), "[t]he court may determine the value

25 of a claim secured by a lien on property in which the estate has an

26 interest, on motion of any party in interest and after a hearing on

27 notice to the holder of the secured claim and any other entity as the

28 court may direct …"

1    In this case, Debtors have provided the Court with a full

2    appraisal of the Real Property showing a market value of $286,000.00.

3    See **Exhibit "F."**  The appraisal was completed on September 8, 2009

4    and was prepared by a disinterested, duly qualified expert within the

5    meaning of Fed. R. Evid. 702.  See **Exhibit "F."**  Accordingly, Debtors

6    request that the Court determine the value of the Real Property to be

7    $286,000.

8    **GIVEN THE VALUE OF THE REAL PROPERTY, THE FIRST DEED OF TRUST IS**

9    **UNDERSECURED AND THE SECOND DEED OF TRUST IS WHOLLY UNSECURED.**

10   FRBP 3012 implements Section 506(a) of the Bankruptcy Code with

11   respect to valuation of a secured claim in order to determine the

12   extent to which it is secured and the extent to which it is

13   unsecured.  Section 506(a) provides:

14   "[a]n allowed claim of a creditor secured by a lien on

15   property in which the estate has an interest,… is a secured

16   claim to the extent of the value of such creditor's

17   interest in the estate's interest in such property,… and is

18   an unsecured claim to the extent that the value of such

19   creditor's interest … is less than the amount of such

20   allowed claim."

21   Additionally, section 506(d) states that, "[t]o the extent that

22   a lien secures a claim against the debtor that it is not an allowed

23   secured claim, such lien is void."

24   Section 506 is a section of general applicability and a Chapter

25   13 case allows bifurcation of a claim into secured and unsecured

26   portions.  <u>Wilson v. Commonwealth Mortgage Corp.</u>, 895 F.2d 123, 22

27   C.B.C. 561 (3rd Cir. 1990).

28

1       **AS A WHOLLY UNSECURED LIENHOLDER, AMERICAN 2'S (SERVICED BY**

2       **BANCO) RIGHTS MAY BE MODIFIED UNDER 11 U.S.C. §1322(B)(2) AND IT**

3       **MAY BE TREATED AS AN UNSECURED CREDITOR.**

4       Many courts, even prior to the passage of the BAPCPA of 2005,

5 had already held that Nobleman v. American Savings Bank, 13 S.Ct.

6 2106 (1993) was inapplicable when senior liens were in excess of the

7 fair market value of the property.  Therefore, the instant case would

8 fall outside the protection otherwise afforded by Nobleman, because

9 claimant's lien is wholly unsecured.

10       The passage of the Bankruptcy Reform Act of 1994 did not change

11 the ability of lien stripping of a wholly unsecured creditor.  It

12 merely provided that a loan which fully matured prior to the filing

13 of the Chapter 13 petition, or a loan which matures during the life

14 of the plan, may be paid through the plan.  11 U.S.C. §1322(b)(2).

15       Under Nobleman, a lien cannot be stripped if any portion of the

16 interest was secured.  Thus, by implication, when a lien is wholly

17 unsecured, it can be stripped.  Courts have consistently

18 distinguished between Nobleman and facts involving a wholly unsecured

19 lien holder.  In fact, most reported decisions have rejected the

20 proposition that Nobleman prohibits modification of a totally

21 unsecured lien on a chapter 13 debtor's principal residence.  These

22 Courts, along with the 9th Circuit Bankruptcy Appellate Panel,

23 interpret Nobleman to require the existence of an allowable secured

24 claim as the predicate for the protection form modification in 11

25 U.S.C. §1322(b)(2).

26       In the 9th Circuit Bankruptcy Appellate Panel Case, In re Lam,

27 the Court held that:

28       "The Nobleman decision holding that section 1322(b) bars a
      chapter 13 plan from modifying the rights of holders of claims,

secured only by the debtor's principal residence, does not apply to holders of totally unsecured claims.   The extension of the protections of section 1322(b) to wholly unsecured lien holders is contrary to the provisions of the bankruptcy code allowing dischargeability of unsecured claims."

In In re Lam, 121 B.R. 36, 41 (9th Cir. B.A.P. 1997), the Court concurred with the holding of several cases that permitted modification of secured creditor's claims that were wholly unsecured. Id., at 41.

Yet another California case has a similar holding to In re Lam. The Court in In re Geyer sustained a debtor's motion to avoid a lien brought under Bankruptcy Code Section 506(d) and held that a Chapter 13 debtor may strip off a lien on his or her primary residence when the lien holder's interest is totally unsecured, stating that:

> [T]he term 'secured claim' as used in section 1322(b)(2) has the same meaning as the term "secured claim" in section 506(a). Unless there is some equity to which the creditor's lien attaches, there is no allowed secured claim and no entitlement to the protection against modification contained in section 1322(b)(2).   A chapter 13 debtor may 'strip-off' a lien on his or her primary residence under the plan or under section 506(d) when the lien holder's interest is totally unsecured.

In re Geyer, 203 B.R. 726, 729 (S.D. Cal. 1996).

The Court's ruling in the case at bar should be unaffected by the landmark Supreme Court case in Nobleman.   In Nobleman, Justice Thomas held that Code Section 1322 (b)(2) prohibits splitting an undersecured home mortgage holder's claim into its secured and unsecured portions for purposes of confirmation of a Chapter 13 Plan. Nobleman, 13 S.Ct. 2106.   Unlike the case at bar, in Nobleman, the lien to be stripped was the holder of the first deed of trust for $71,335.00, and the debtor's principal residence was worth $23,500.00.   Thus, the bank's claim was at least partially secured by the debtor's home.

1   Here, American 2's lien (serviced by Banco) is not the first but

2   the second deed of trust. See **Exhibit "D."** Further, there can be no

3   reasonable contention that any part of the second deed of trust is

4   secured. Thus, the facts, reasoning and holding of <u>Nobleman</u> are

5   inapplicable to this case.

6   In this case, the Real Property is Debtors' principal residence

7   which has a market value of $286,000. See **Exhibit "F."** American 1's

8   **first** deed of trust (serviced by IndyMac) has a balance of $385,000.

9   See **Exhibit "C."** Thus, American 2's (serviced by Banco) secured

10  interest in the Real Property is zero because there is absolutely no

11  equity to which its lien could attach.

12  Because American 2's mortgage interest (serviced by Banco) is a

13  totally unsecured claim on Debtors' residence and it does not have an

14  allowable secured claim, American 2 (serviced by Banco) cannot seek

15  protection from modification under 11 U.S.C. §1322 (b)(2) and Debtors

16  may modify the claim and avoid claimant's lien. Therefore, American

17  2's deed of trust (serviced by Banco) should be extinguished,

18  reconveyed, and treated as unsecured for purposes of this Chapter 13

19  proceeding.

20  **<u>IN RE DEWSNUP</u> IS DISTINGUISHED FROM THE LIEN STRIPPING REQUESTED**

21  **IN THIS CHAPTER 13 CASE.**

22  The Chapter 7 case <u>Dewsnup v. Tim</u>, 502 U.S. 410, 112 S. Ct. 773,

23  116 L.Ed.2d 903 (1992) has no application to this Chapter 13 case.

24  The relevant cases are those Chapter 13 cases cited by Debtors above

25  which turn on interpretations of §1322(b)(2). Those interpretations

26  conclude that a Chapter 13 plan may modify the rights of claim

27  holders, other those **secured** only by a security interest in real

28  property that is the debtor's principal residence.

Section 1322(b)(2), in light of §506(a), does not preclude modification by a Chapter 13 Plan of the rights of holders of unsecured claims even those of holders of deeds of trust which are completely unsecured.

To this end, Justice Scalia, in his dissent in <u>Dewsnup</u>, pointed out the difference between lien stripping in a Chapter 7 case and lien stripping in a Chapter 13 case when he stated that,

> "Respondents assume, for example, that a debtor in a Chapter 13 cannot strip down a mortgage placed on the debtor's home,; but that assumption may beg the very question the Court answers today. True, Section 1322 (b)(2) provides that Chapter 13 filers may not "modify the rights of secured claims", that are "secured only by a security interest in real property that is the debtor's principal residence. But this can be and has been read, in light of Section 506(a), to prohibit modification of the mortgagee's rights only with respect to the operation of his claim that is deemed secured under the Code. <u>See</u>, e.g., <u>In re Hart</u> 923 F.2d 1410, 1415 (CA 10 1991); <u>Wilson v. Commonwealth Mortgage Corp.</u>, 895 F.2d 123, 127 CA3 1990)."

<u>Dewsnup</u>, 502 U.S. 410, 428, 112 S. Ct. 773, 784.

In <u>Denver v. Internal Revenue Service</u>, 164 B.R. 132 (C.D. Cal. 1994), the Court held that in spite of <u>Dewsnup</u>, stripping an IRS lien on a principal residence is permissible in a Chapter 11 case. The Court noted that while under <u>Dewsnup</u>, Chapter 7 debtor cannot use §506 to strip liens on an undersecured claim, the Supreme Court specifically reserved the question as to the applicability of its ruling in <u>Dewsnup</u> to cases under the reorganization chapters. <u>Id.</u>, at 133. The Denver Court discussed the issue of lien stripping in Chapter 13 cases and cited the 10th Circuit case of <u>In re Hart</u> wherein the Court reasoned:

> The dispositive issue in this case is whether Eastland's undersecured loan may be bifurcated into two claims by

applying general principals of Section 506(a) to the
mortgage and then protecting only the secured claim by
provisions of Section 1322(b).  We believe it can.

In re Hart, 923 F.2d 1410, 1413 (10th Cir. 1991).

After citing In re Hart, in Denver the Court went on to state:

"If Section 506 does not permit debtor to bifurcate
undersecured claims and strip down liens to their
collateral value, then all secured creditors would be freed
of any concern that debtor could reduce the amount of their
liens while retaining property.  If Congress did not intend
to allow lien stripping in general in Chapter 13 cases,
then why would it bother to draft the exclusionary language
of Section 1322.  As Justice Stevens' concurring opinion in
Nobleman emphasized, the legislative history of Section
1322(b)(2) reflects Congressional desire to provide special
protections to residential lenders."  Denver, at 141.

Accordingly, the language of the relevant Bankruptcy Code

sections and the decisions interpreting those sections warrants a

finding that American 2's lien (serviced by Banco) arising from the

deed of trust may be extinguished and that its claim may be treated

as general unsecured in Debtors' plan.


III.

CONCLUSION

Clearly the Deed of Trust of American 2's mortgage (serviced

by Banco) is wholly unsecured as evidenced by the appraisal and

points and authorities.  Based on the foregoing, the Debtors

respectfully request that the Second Deed of Trust be ordered

extinguished, and deemed an unsecured claim and to have no further

force or effects as a secured lien against the Debtors' residential

property. In the alternative, the Debtors respectfully request to

1 | deem the Second as an unsecured claim during the life of the

2 | Debtors' chapter 13 plan, that upon the completion of all plan

3 | payments and entry of discharge in this case pursuant to 11 U.S.C.

4 | §1328, the lien of American 2's mortgage (serviced by Banco) will

5 | be void and will not constitute an encumbrance on the real property

6 | described in the motion, that upon completion of all plan payments

7 | and upon entry of discharge in this case, American 2 (serviced by

8 | Banco) is ordered to expeditiously reconvey the Deed of Trust and

9 | otherwise take such steps as are required to clear title, free of

10 | said lien, as to real property described in this motion. **The lien**

11 | **shall remain valid if the case is dismissed or converted to another**

12 | **chapter.**

DATED: January 4, 2009            Price Law Group, APC


                        By: _____
                             Rabin J. Pournazarian
                             Attorneys for Debtors

# Declaration of Debtor

## DECLARATION OF MARTHA E. CHAMBERLIN-LOMBARDO

## CASE NUMBER: SAC9-23461-RK

I, Martha E. Chamberlin-Lombardo, declare:

1.  My husband and I are debtors in Chapter 13 case number SA09-23461-RK.  I have personal knowledge of the facts stated in this declaration and could and would testify thereto if called as a witness.

2.  My husband and I filed this case on December 2, 2009.  I am the owner of real property located at 2541 Stanton Avenue, La Habra, CA 90631 (the "Real Property").  My husband and I live on the Real Property and disclosed it in our bankruptcy schedules.  A true and correct copy of our Schedule A is attached as **Exhibit "A"** and is incorporated herein by this reference.

3.  The Real Property was subject to a first deed of trust in favor of American Mortgage Network, Inc.  A true and correct copy of the first Deed of Trust is attached as **Exhibit "B"** and is incorporated herein by this reference.  The current servicing agent of the loan is IndyMac Mortgage Services, which is owed a balance of approximately $385,000.  A true and correct copy of a mortgage statement is attached as **Exhibit "C"** and is incorporated herein by this reference.

4.  A second Deed of Trust encumbered the Real Property also in favor of American Mortgage Network, Inc.  A true and correct copy of the second Deed of Trust is attached as **Exhibit "D"** and is incorporated herein by this reference.  The current servicing agent of the loan is Banco Popular North America, which is owed a balance of approximately $109,863.36 as of the Filing Date.  A true and

1  correct copy of a mortgage statement is attached as **Exhibit "E"** and

2  is incorporated herein by this reference.

3  5.      On or about September 8, 2009, my husband and I hired

4  Absolute Appraisals to provide an opinion of the fair market

5  value of the Real Property.  We have no personal or business

6  relationship with any employee of Absolute Appraisals.

7      I declare under penalty of perjury that the foregoing is true

8  and correct.  Executed on December $\underline{31}$, 2009 at $\underline{La\ Habra}$,

9  CA.

10

11

12                                          Martha E. Chamberlin-Lombardo

# Declaration of Appraiser

DECLARATION OF GREGG WYNN

IN SUPPORT OF VALUATION OF REAL PROPERTY

IN RE: ANDREW & MARTHA LOMBARDO

I, Gregg Wynn, declare:

1. I am a real estate appraiser, State of California License #AR011084.   I make this declaration based on my own personal knowledge, my education, my training and experience in the field of real estate appraisal and if called as a witness, I could and would competently testify thereto the facts stated herein.

2. I have held a California Real Estate Appraiser License since 1991 and have been doing residential real estate appraisals since 1991 .   I am actively employed as a real estate appraiser and perform approximately 10 per month.

3. In September 2009, I was retained by Andrew & Martha Lombardo to examine and appraise a single family residence located at 2541 Stanton Avenue, La Habra, CA 90631 (the "Property").   Attached as Exhibit "F" is a true and correct copy of the Appraisal of Real Property report I prepared with respect to the Property.

4. In determining the fair market value of the Property, I used the sales comparison approach.   I consider the sales approach to be the most reliable in determining the fair market value because it more accurately simulates buyer's perceptions and actions.

5. Based upon my observations, inspection of the subject property, and market research as well as my training, education and

experience as a residential appraiser, it is my professional opinion that the Property has a fair market value of $286,000.00 as of September 8, 2009.

6. I have no present or contemplated future interest in the Property. Neither my employment nor my compensation for the appraisal is contingent on the value found. I have no familial or personal relationship with Mr. or Mrs. Lombardo other than the preparation of this appraisal.

I declare under the penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on December __31st__, 2009 at __La Habra__, California.

Gregg Wynn

# EXHIBIT "A"

B6A (Official Form 6A) (12/07)

In re    **Andrew Joseph Lombardo,**                Case No.   **SA09-23461-RK**
          **Martha Evelyn Chamberlin-Lombardo**

Debtors

# SCHEDULE A - REAL PROPERTY

Except as directed below, list all real property in which the debtor has any legal, equitable, or future interest, including all property owned as a cotenant, community property, or in which the debtor has a life estate. Include any property in which the debtor holds rights and powers exercisable for the debtor's own benefit. If the debtor is married, state whether husband, wife, both, or the marital community own the property by placing an "H," "W," "J," or "C" in the column labeled "Husband, Wife, Joint, or Community." If the debtor holds no interest in real property, write "None" under "Description and Location of Property."

**Do not include interests in executory contracts and unexpired leases on this schedule. List them in Schedule G - Executory Contracts and Unexpired Leases.**

If an entity claims to have a lien or hold a secured interest in any property, state the amount of the secured claim. See Schedule D. If no entity claims to hold a secured interest in the property, write "None" in the column labeled "Amount of Secured Claim." If the debtor is an individual or if a joint petition is filed, state the amount of any exemption claimed in the property only in Schedule C - Property Claimed as Exempt.

| Description and Location of Property | Nature of Debtor's Interest in Property | Husband, Wife, Joint, or Community | Current Value of Debtor's Interest in Property, without Deducting any Secured Claim or Exemption | Amount of Secured Claim |
|---|---|---|---|---|
| **Residence:**<br>**2541 Stanton Avenue**<br>**La Habra, CA 90631**<br><br>**1st DOT Due/Late:  1st / 16th**<br>**2nd DOT Due/Late:  10th / 25th.**<br><br>**Fair market value is based on comparables in the area.** | **Fee Simple** | **W** | **286,000.00** | **494,863.00** |

| | | |
|---|---|---|
| Sub-Total > | **286,000.00** | (Total of this page) |
| Total > | **286,000.00** | |

  **0**   continuation sheets attached to the Schedule of Real Property        (Report also on Summary of Schedules)

20

Copyright (c) 1996-2009 - Best Case Solutions - Evanston, IL - (800) 492-8037               Best Case Bankruptcy

# EXHIBIT "B"

Recording Requested By:
LANDAMERICA LAWYERS TITLE

Return To:

AMERICAN MORTGAGE NETWORK, INC.
P. O. BOX 85463
SAN DIEGO, CALIFORNIA 92186

Prepared By:
DIANA GREENLEE

──────────────────── [Space Above This Line For Recording Data] ────────────────────

# DEED OF TRUST

LOAN NO. ▆▆▆▆4636

MIN ▆▆▆▆▆▆▆▆636-9

## DEFINITIONS

Words used in multiple sections of this document are defined below and other words are defined in Sections 3, 11, 13, 18, 20 and 21. Certain rules regarding the usage of words used in this document are also provided in Section 16.

**(A) "Security Instrument"** means this document, which is dated  DECEMBER 20, 2005                    ,
together with all Riders to this document.
**(B) "Borrower"** is

    MARTHA E. CHAMBERLIN-LOMBARDO, A MARRIED WOMAN

Borrower's address is  2541 STANTON AVENUE, LA HABRA, CALIFORNIA 90631
                                        . Borrower is the trustor under this Security Instrument.
**(C) "Lender"** is  AMERICAN MORTGAGE NETWORK, INC., A DELAWARE CORPORATION

Lender is a    CORPORATION
organized and existing under the laws of  THE STATE OF DELAWARE

**CALIFORNIA**-Single Family-Fannie Mae/Freddie Mac **UNIFORM INSTRUMENT WITH MERS**          **Form 3005  1/01**



**VMP** -6A(CA) (0207)

Page 1 of 15

   VMP MORTGAGE FORMS - (800)521-7291

Lender's address is   P. O. BOX 85463, SAN DIEGO, CA 92186

(D) "Trustee" is   FIRST AMERICAN TITLE INSURANCE COMPANY

(E) "MERS" is Mortgage Electronic Registration Systems, Inc. MERS is a separate corporation that is acting solely as a nominee for Lender and Lender's successors and assigns. **MERS is the beneficiary under this Security Instrument.** MERS is organized and existing under the laws of Delaware, and has an address and telephone number of P.O. Box 2026, Flint, MI 48501-2026, tel. (888) 679-MERS.

(F) "Note" means the promissory note signed by Borrower and dated   DECEMBER 20, 2005 .
The Note states that Borrower owes Lender   THREE HUNDRED EIGHTY FIVE THOUSAND AND 00/100                                                                   Dollars
(U.S. $   385,000.00 ) plus interest. Borrower has promised to pay this debt in regular Periodic Payments and to pay the debt in full not later than   JANUARY 01, 2036 .

(G) "Property" means the property that is described below under the heading "Transfer of Rights in the Property."

(H) "Loan" means the debt evidenced by the Note, plus interest, any prepayment charges and late charges due under the Note, and all sums due under this Security Instrument, plus interest.

(I) "Riders" means all Riders to this Security Instrument that are executed by Borrower. The following Riders are to be executed by Borrower [check box as applicable]:

| [X] Adjustable Rate Rider | [ ] Condominium Rider | [ ] Second Home Rider |
| [ ] Balloon Rider | [ ] Planned Unit Development Rider | [ ] 1-4 Family Rider |
| [ ] VA Rider | [ ] Biweekly Payment Rider | [ ] Other(s) [specify] |

(J) "Applicable Law" means all controlling applicable federal, state and local statutes, regulations, ordinances and administrative rules and orders (that have the effect of law) as well as all applicable final, non-appealable judicial opinions.

(K) "Community Association Dues, Fees, and Assessments" means all dues, fees, assessments and other charges that are imposed on Borrower or the Property by a condominium association, homeowners association or similar organization.

(L) "Electronic Funds Transfer" means any transfer of funds, other than a transaction originated by check, draft, or similar paper instrument, which is initiated through an electronic terminal, telephonic instrument, computer, or magnetic tape so as to order, instruct, or authorize a financial institution to debit or credit an account. Such term includes, but is not limited to, point-of-sale transfers, automated teller machine transactions, transfers initiated by telephone, wire transfers, and automated clearinghouse transfers.

(M) "Escrow Items" means those items that are described in Section 3.

(N) "Miscellaneous Proceeds" means any compensation, settlement, award of damages, or proceeds paid by any third party (other than insurance proceeds paid under the coverages described in Section 5) for: (i) damage to, or destruction of, the Property; (ii) condemnation or other taking of all or any part of the Property; (iii) conveyance in lieu of condemnation; or (iv) misrepresentations of, or omissions as to, the value and/or condition of the Property.

(O) "Mortgage Insurance" means insurance protecting Lender against the nonpayment of, or default on, the Loan.

(P) "Periodic Payment" means the regularly scheduled amount due for (i) principal and interest under the Note, plus (ii) any amounts under Section 3 of this Security Instrument.

(Q) **"RESPA"** means the Real Estate Settlement Procedures Act (12 U.S.C. Section 2601 et seq.) and its implementing regulation, Regulation X (24 C.F.R. Part 3500), as they might be amended from time to time, or any additional or successor legislation or regulation that governs the same subject matter. As used in this Security Instrument, "RESPA" refers to all requirements and restrictions that are imposed in regard to a "federally related mortgage loan" even if the Loan does not qualify as a "federally related mortgage loan" under RESPA.

(R) **"Successor in Interest of Borrower"** means any party that has taken title to the Property, whether or not that party has assumed Borrower's obligations under the Note and/or this Security Instrument.

TRANSFER OF RIGHTS IN THE PROPERTY

The beneficiary of this Security Instrument is MERS (solely as nominee for Lender and Lender's successors and assigns) and the successors and assigns of MERS. This Security Instrument secures to Lender: (i) the repayment of the Loan, and all renewals, extensions and modifications of the Note; and (ii) the performance of Borrower's covenants and agreements under this Security Instrument and the Note. For this purpose, Borrower irrevocably grants and conveys to Trustee, in trust, with power of sale, the following described property located in the
COUNTY        of        ORANGE        :
    [Type of Recording Jurisdiction]              [Name of Recording Jurisdiction]

LEGAL DESCRIPTION ATTACHED HERE TO AND MADE A PART HEREOF.

Parcel ID Number:    018-221-06                which currently has the address of
                  2541 STANTON AVENUE                              [Street]
                  LA HABRA           [City], California    90631      [Zip Code]
("Property Address"):

     TOGETHER WITH all the improvements now or hereafter erected on the property, and all easements, appurtenances, and fixtures now or hereafter a part of the property. All replacements and additions shall also be covered by this Security Instrument. All of the foregoing is referred to in this Security Instrument as the "Property." Borrower understands and agrees that MERS holds only legal title to the interests granted by Borrower in this Security Instrument, but, if necessary to comply with law or custom, MERS (as nominee for Lender and Lender's successors and assigns) has the right: to exercise any or all of those interests, including, but not limited to, the right to foreclose and sell the Property; and to take any action required of Lender including, but not limited to, releasing and canceling this Security Instrument.

     BORROWER COVENANTS that Borrower is lawfully seised of the estate hereby conveyed and has the right to grant and convey the Property and that the Property is unencumbered, except for encumbrances

of record. Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.

THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property.

UNIFORM COVENANTS. Borrower and Lender covenant and agree as follows:

1. **Payment of Principal, Interest, Escrow Items, Prepayment Charges, and Late Charges.** Borrower shall pay when due the principal of, and interest on, the debt evidenced by the Note and any prepayment charges and late charges due under the Note. Borrower shall also pay funds for Escrow Items pursuant to Section 3. Payments due under the Note and this Security Instrument shall be made in U.S. currency. However, if any check or other instrument received by Lender as payment under the Note or this Security Instrument is returned to Lender unpaid, Lender may require that any or all subsequent payments due under the Note and this Security Instrument be made in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality, or entity; or (d) Electronic Funds Transfer.

Payments are deemed received by Lender when received at the location designated in the Note or at such other location as may be designated by Lender in accordance with the notice provisions in Section 15. Lender may return any payment or partial payment if the payment or partial payments are insufficient to bring the Loan current. Lender may accept any payment or partial payment insufficient to bring the Loan current, without waiver of any rights hereunder or prejudice to its rights to refuse such payment or partial payments in the future, but Lender is not obligated to apply such payments at the time such payments are accepted. If each Periodic Payment is applied as of its scheduled due date, then Lender need not pay interest on unapplied funds. Lender may hold such unapplied funds until Borrower makes payment to bring the Loan current. If Borrower does not do so within a reasonable period of time, Lender shall either apply such funds or return them to Borrower. If not applied earlier, such funds will be applied to the outstanding principal balance under the Note immediately prior to foreclosure. No offset or claim which Borrower might have now or in the future against Lender shall relieve Borrower from making payments due under the Note and this Security Instrument or performing the covenants and agreements secured by this Security Instrument.

2. **Application of Payments or Proceeds.** Except as otherwise described in this Section 2, all payments accepted and applied by Lender shall be applied in the following order of priority: (a) interest due under the Note; (b) principal due under the Note; (c) amounts due under Section 3. Such payments shall be applied to each Periodic Payment in the order in which it became due. Any remaining amounts shall be applied first to late charges, second to any other amounts due under this Security Instrument, and then to reduce the principal balance of the Note.

If Lender receives a payment from Borrower for a delinquent Periodic Payment which includes a sufficient amount to pay any late charge due, the payment may be applied to the delinquent payment and the late charge. If more than one Periodic Payment is outstanding, Lender may apply any payment received from Borrower to the repayment of the Periodic Payments if, and to the extent that, each payment can be paid in full. To the extent that any excess exists after the payment is applied to the full payment of one or more Periodic Payments, such excess may be applied to any late charges due. Voluntary prepayments shall be applied first to any prepayment charges and then as described in the Note.

Any application of payments, insurance proceeds, or Miscellaneous Proceeds to principal due under the Note shall not extend or postpone the due date, or change the amount, of the Periodic Payments.

3. **Funds for Escrow Items.** Borrower shall pay to Lender on the day Periodic Payments are due under the Note, until the Note is paid in full, a sum (the "Funds") to provide for payment of amounts due for: (a) taxes and assessments and other items which can attain priority over this Security Instrument as a lien or encumbrance on the Property; (b) leasehold payments or ground rents on the Property, if any; (c) premiums for any and all insurance required by Lender under Section 5; and (d) Mortgage Insurance premiums, if any, or any sums payable by Borrower to Lender in lieu of the payment of Mortgage Insurance premiums in accordance with the provisions of Section 10. These items are called "Escrow Items." At origination or at any time during the term of the Loan, Lender may require that Community Association Dues, Fees, and Assessments, if any, be escrowed by Borrower, and such dues, fees and assessments shall be an Escrow Item. Borrower shall promptly furnish to Lender all notices of amounts to be paid under this Section. Borrower shall pay Lender the Funds for Escrow Items unless Lender waives Borrower's obligation to pay the Funds for any or all Escrow Items. Lender may waive Borrower's obligation to pay to Lender Funds for any or all Escrow Items at any time. Any such waiver may only be

25

in writing. In the event of such waiver, Borrower shall pay directly, when and where payable, the amounts due for any Escrow Items for which payment of Funds has been waived by Lender and, if Lender requires, shall furnish to Lender receipts evidencing such payment within such time period as Lender may require. Borrower's obligation to make such payments and to provide receipts shall for all purposes be deemed to be a covenant and agreement contained in this Security Instrument, as the phrase "covenant and agreement" is used in Section 9. If Borrower is obligated to pay Escrow Items directly, pursuant to a waiver, and Borrower fails to pay the amount due for an Escrow Item, Lender may exercise its rights under Section 9 and pay such amount and Borrower shall then be obligated under Section 9 to repay to Lender any such amount. Lender may revoke the waiver as to any or all Escrow Items at any time by a notice given in accordance with Section 15 and, upon such revocation, Borrower shall pay to Lender all Funds, and in such amounts, that are then required under this Section 3.

Lender may, at any time, collect and hold Funds in an amount (a) sufficient to permit Lender to apply the Funds at the time specified under RESPA, and (b) not to exceed the maximum amount a lender can require under RESPA. Lender shall estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with Applicable Law.

The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Lender, if Lender is an institution whose deposits are so insured) or in any Federal Home Loan Bank. Lender shall apply the Funds to pay the Escrow Items no later than the time specified under RESPA. Lender shall not charge Borrower for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Lender pays Borrower interest on the Funds and Applicable Law permits Lender to make such a charge. Unless an agreement is made in writing or Applicable Law requires interest to be paid on the Funds, Lender shall not be required to pay Borrower any interest or earnings on the Funds. Borrower and Lender can agree in writing, however, that interest shall be paid on the Funds. Lender shall give to Borrower, without charge, an annual accounting of the Funds as required by RESPA.

If there is a surplus of Funds held in escrow, as defined under RESPA, Lender shall account to Borrower for the excess funds in accordance with RESPA. If there is a shortage of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the shortage in accordance with RESPA, but in no more than 12 monthly payments. If there is a deficiency of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the deficiency in accordance with RESPA, but in no more than 12 monthly payments.

Upon payment in full of all sums secured by this Security Instrument, Lender shall promptly refund to Borrower any Funds held by Lender.

**4. Charges; Liens.** Borrower shall pay all taxes, assessments, charges, fines, and impositions attributable to the Property which can attain priority over this Security Instrument, leasehold payments or ground rents on the Property, if any, and Community Association Dues, Fees, and Assessments, if any. To the extent that these items are Escrow Items, Borrower shall pay them in the manner provided in Section 3.

Borrower shall promptly discharge any lien which has priority over this Security Instrument unless Borrower: (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender, but only so long as Borrower is performing such agreement; (b) contests the lien in good faith by, or defends against enforcement of the lien in, legal proceedings which in Lender's opinion operate to prevent the enforcement of the lien while those proceedings are pending, but only until such proceedings are concluded; or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument. If Lender determines that any part of the Property is subject to a lien which can attain priority over this Security Instrument, Lender may give Borrower a notice identifying the

 -6A(CA) (0207)

Page 5 of 16

Form 3005   1/01

lien. Within 10 days of the date on which that notice is given, Borrower shall satisfy the lien or take one or more of the actions set forth above in this Section 4.

Lender may require Borrower to pay a one-time charge for a real estate tax verification and/or reporting service used by Lender in connection with this Loan.

**5. Property Insurance.** Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards including, but not limited to, earthquakes and floods, for which Lender requires insurance. This insurance shall be maintained in the amounts (including deductible levels) and for the periods that Lender requires. What Lender requires pursuant to the preceding sentences can change during the term of the Loan. The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's right to disapprove Borrower's choice, which right shall not be exercised unreasonably. Lender may require Borrower to pay, in connection with this Loan, either: (a) a one-time charge for flood zone determination, certification and tracking services; or (b) a one-time charge for flood zone determination and certification services and subsequent charges each time remappings or similar changes occur which reasonably might affect such determination or certification. Borrower shall also be responsible for the payment of any fees imposed by the Federal Emergency Management Agency in connection with the review of any flood zone determination resulting from an objection by Borrower.

If Borrower fails to maintain any of the coverages described above, Lender may obtain insurance coverage, at Lender's option and Borrower's expense. Lender is under no obligation to purchase any particular type or amount of coverage. Therefore, such coverage shall cover Lender, but might or might not protect Borrower, Borrower's equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect. Borrower acknowledges that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that Borrower could have obtained. Any amounts disbursed by Lender under this Section 5 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

All insurance policies required by Lender and renewals of such policies shall be subject to Lender's right to disapprove such policies, shall include a standard mortgage clause, and shall name Lender as mortgagee and/or as an additional loss payee and Borrower further agrees to generally assign rights to insurance proceeds to the holder of the Note up to the amount of the outstanding loan balance. Lender shall have the right to hold the policies and renewal certificates. If Lender requires, Borrower shall promptly give to Lender all receipts of paid premiums and renewal notices. If Borrower obtains any form of insurance coverage, not otherwise required by Lender, for damage to, or destruction of, the Property, such policy shall include a standard mortgage clause and shall name Lender as mortgagee and/or as an additional loss payee and Borrower further agrees to generally assign rights to insurance proceeds to the holder of the Note up to the amount of the outstanding loan balance.

In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower. Unless Lender and Borrower otherwise agree in writing, any insurance proceeds, whether or not the underlying insurance was required by Lender, shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such insurance proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such insurance proceeds, Lender shall not be required to pay Borrower any interest or earnings on such proceeds. Fees for public adjusters, or other third parties, retained by Borrower shall not be paid out of the insurance proceeds and shall be the sole obligation of Borrower. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with

the excess, if any, paid to Borrower. Such insurance proceeds shall be applied in the order provided for in Section 2.

If Borrower abandons the Property, Lender may file, negotiate and settle any available insurance claim and related matters. If Borrower does not respond within 30 days to a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may negotiate and settle the claim. The 30-day period will begin when the notice is given. In either event, or if Lender acquires the Property under Section 22 or otherwise, Borrower hereby assigns to Lender (a) Borrower's rights to any insurance proceeds in an amount not to exceed the amounts unpaid under the Note or this Security Instrument, and (b) any other of Borrower's rights (other than the right to any refund of unearned premiums paid by Borrower) under all insurance policies covering the Property, insofar as such rights are applicable to the coverage of the Property. Lender may use the insurance proceeds either to repair or restore the Property or to pay amounts unpaid under the Note or this Security Instrument, whether or not then due.

**6. Occupancy.** Borrower shall occupy, establish, and use the Property as Borrower's principal residence within 60 days after the execution of this Security Instrument and shall continue to occupy the Property as Borrower's principal residence for at least one year after the date of occupancy, unless Lender otherwise agrees in writing, which consent shall not be unreasonably withheld, or unless extenuating circumstances exist which are beyond Borrower's control.

**7. Preservation, Maintenance and Protection of the Property; Inspections.** Borrower shall not destroy, damage or impair the Property, allow the Property to deteriorate or commit waste on the Property. Whether or not Borrower is residing in the Property, Borrower shall maintain the Property in order to prevent the Property from deteriorating or decreasing in value due to its condition. Unless it is determined pursuant to Section 5 that repair or restoration is not economically feasible, Borrower shall promptly repair the Property if damaged to avoid further deterioration or damage. If insurance or condemnation proceeds are paid in connection with damage to, or the taking of, the Property, Borrower shall be responsible for repairing or restoring the Property only if Lender has released proceeds for such purposes. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. If the insurance or condemnation proceeds are not sufficient to repair or restore the Property, Borrower is not relieved of Borrower's obligation for the completion of such repair or restoration.

Lender or its agent may make reasonable entries upon and inspections of the Property. If it has reasonable cause, Lender may inspect the interior of the improvements on the Property. Lender shall give Borrower notice at the time of or prior to such an interior inspection specifying such reasonable cause.

**8. Borrower's Loan Application.** Borrower shall be in default if, during the Loan application process, Borrower or any persons or entities acting at the direction of Borrower or with Borrower's knowledge or consent gave materially false, misleading, or inaccurate information or statements to Lender (or failed to provide Lender with material information) in connection with the Loan. Material representations include, but are not limited to, representations concerning Borrower's occupancy of the Property as Borrower's principal residence.

**9. Protection of Lender's Interest in the Property and Rights Under this Security Instrument.** If (a) Borrower fails to perform the covenants and agreements contained in this Security Instrument, (b) there is a legal proceeding that might significantly affect Lender's interest in the Property and/or rights under this Security Instrument (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture, for enforcement of a lien which may attain priority over this Security Instrument or to enforce laws or regulations), or (c) Borrower has abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument, including protecting and/or assessing the value of the Property, and securing and/or repairing the Property. Lender's actions can include, but are not limited to: (a) paying any sums secured by a lien which has priority over this Security Instrument; (b) appearing in court; and (c) paying reasonable



attorneys' fees to protect its interest in the Property and/or rights under this Security Instrument, including its secured position in a bankruptcy proceeding. Securing the Property includes, but is not limited to, entering the Property to make repairs, change locks, replace or board up doors and windows, drain water from pipes, eliminate building or other code violations or dangerous conditions, and have utilities turned on or off. Although Lender may take action under this Section 9, Lender does not have to do so and is not under any duty or obligation to do so. It is agreed that Lender incurs no liability for not taking any or all actions authorized under this Section 9.

Any amounts disbursed by Lender under this Section 9 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

If this Security Instrument is on a leasehold, Borrower shall comply with all the provisions of the lease. If Borrower acquires fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing.

10. **Mortgage Insurance.** If Lender required Mortgage Insurance as a condition of making the Loan, Borrower shall pay the premiums required to maintain the Mortgage Insurance in effect. If, for any reason, the Mortgage Insurance coverage required by Lender ceases to be available from the mortgage insurer that previously provided such insurance and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to obtain coverage substantially equivalent to the Mortgage Insurance previously in effect, at a cost substantially equivalent to the cost to Borrower of the Mortgage Insurance previously in effect, from an alternate mortgage insurer selected by Lender. If substantially equivalent Mortgage Insurance coverage is not available, Borrower shall continue to pay to Lender the amount of the separately designated payments that were due when the insurance coverage ceased to be in effect. Lender will accept, use and retain these payments as a non-refundable loss reserve in lieu of Mortgage Insurance. Such loss reserve shall be non-refundable, notwithstanding the fact that the Loan is ultimately paid in full, and Lender shall not be required to pay Borrower any interest or earnings on such loss reserve. Lender can no longer require loss reserve payments if Mortgage Insurance coverage (in the amount and for the period that Lender requires) provided by an insurer selected by Lender again becomes available, is obtained, and Lender requires separately designated payments toward the premiums for Mortgage Insurance. If Lender required Mortgage Insurance as a condition of making the Loan and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to maintain Mortgage Insurance in effect, or to provide a non-refundable loss reserve, until Lender's requirement for Mortgage Insurance ends in accordance with any written agreement between Borrower and Lender providing for such termination or until termination is required by Applicable Law. Nothing in this Section 10 affects Borrower's obligation to pay interest at the rate provided in the Note.

Mortgage Insurance reimburses Lender (or any entity that purchases the Note) for certain losses it may incur if Borrower does not repay the Loan as agreed. Borrower is not a party to the Mortgage Insurance.

Mortgage insurers evaluate their total risk on all such insurance in force from time to time, and may enter into agreements with other parties that share or modify their risk, or reduce losses. These agreements are on terms and conditions that are satisfactory to the mortgage insurer and the other party (or parties) to these agreements. These agreements may require the mortgage insurer to make payments using any source of funds that the mortgage insurer may have available (which may include funds obtained from Mortgage Insurance premiums).

As a result of these agreements, Lender, any purchaser of the Note, another insurer, any reinsurer, any other entity, or any affiliate of any of the foregoing, may receive (directly or indirectly) amounts that derive from (or might be characterized as) a portion of Borrower's payments for Mortgage Insurance, in exchange for sharing or modifying the mortgage insurer's risk, or reducing losses. If such agreement provides that an affiliate of Lender takes a share of the insurer's risk in exchange for a share of the premiums paid to the insurer, the arrangement is often termed "captive reinsurance." Further:

(a) **Any such agreements will not affect the amounts that Borrower has agreed to pay for Mortgage Insurance, or any other terms of the Loan. Such agreements will not increase the amount Borrower will owe for Mortgage Insurance, and they will not entitle Borrower to any refund.**

29

**(b) Any such agreements will not affect the rights Borrower has – if any – with respect to the Mortgage Insurance under the Homeowners Protection Act of 1998 or any other law. These rights may include the right to receive certain disclosures, to request and obtain cancellation of the Mortgage Insurance, to have the Mortgage Insurance terminated automatically, and/or to receive a refund of any Mortgage Insurance premiums that were unearned at the time of such cancellation or termination.**

**11. Assignment of Miscellaneous Proceeds; Forfeiture.** All Miscellaneous Proceeds are hereby assigned to and shall be paid to Lender.

If the Property is damaged, such Miscellaneous Proceeds shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such Miscellaneous Proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may pay for the repairs and restoration in a single disbursement or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such Miscellaneous Proceeds, Lender shall not be required to pay Borrower any interest or earnings on such Miscellaneous Proceeds. If the restoration or repair is not economically feasible or Lender's security would be lessened, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such Miscellaneous Proceeds shall be applied in the order provided for in Section 2.

In the event of a total taking, destruction, or loss in value of the Property, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is equal to or greater than the amount of the sums secured by this Security Instrument immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the sums secured by this Security Instrument shall be reduced by the amount of the Miscellaneous Proceeds multiplied by the following fraction: (a) the total amount of the sums secured immediately before the partial taking, destruction, or loss in value divided by (b) the fair market value of the Property immediately before the partial taking, destruction, or loss in value. Any balance shall be paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is less than the amount of the sums secured immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument whether or not the sums are then due.

If the Property is abandoned by Borrower, or if, after notice by Lender to Borrower that the Opposing Party (as defined in the next sentence) offers to make an award to settle a claim for damages, Borrower fails to respond to Lender within 30 days after the date the notice is given, Lender is authorized to collect and apply the Miscellaneous Proceeds either to restoration or repair of the Property or to the sums secured by this Security Instrument, whether or not then due. "Opposing Party" means the third party that owes Borrower Miscellaneous Proceeds or the party against whom Borrower has a right of action in regard to Miscellaneous Proceeds.

Borrower shall be in default if any action or proceeding, whether civil or criminal, is begun that, in Lender's judgment, could result in forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. Borrower can cure such a default and, if acceleration has occurred, reinstate as provided in Section 19, by causing the action or proceeding to be dismissed with a ruling that, in Lender's judgment, precludes forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. The proceeds of any award or claim for damages that are attributable to the impairment of Lender's interest in the Property are hereby assigned and shall be paid to Lender.

All Miscellaneous Proceeds that are not applied to restoration or repair of the Property shall be applied in the order provided for in Section 2.

**12. Borrower Not Released; Forbearance By Lender Not a Waiver.** Extension of the time for payment or modification of amortization of the sums secured by this Security Instrument granted by Lender



to Borrower or any Successor in Interest of Borrower shall not operate to release the liability of Borrower or any Successors in Interest of Borrower. Lender shall not be required to commence proceedings against any Successor in Interest of Borrower or to refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original Borrower or any Successors in Interest of Borrower. Any forbearance by Lender in exercising any right or remedy including, without limitation, Lender's acceptance of payments from third persons, entities or Successors in Interest of Borrower or in amounts less than the amount then due, shall not be a waiver of or preclude the exercise of any right or remedy.

**13. Joint and Several Liability; Co-signers; Successors and Assigns Bound.** Borrower covenants and agrees that Borrower's obligations and liability shall be joint and several. However, any Borrower who co-signs this Security Instrument but does not execute the Note (a "co-signer"): (a) is co-signing this Security Instrument only to mortgage, grant and convey the co-signer's interest in the Property under the terms of this Security Instrument; (b) is not personally obligated to pay the sums secured by this Security Instrument; and (c) agrees that Lender and any other Borrower can agree to extend, modify, forbear or make any accommodations with regard to the terms of this Security Instrument or the Note without the co-signer's consent.

Subject to the provisions of Section 18, any Successor in Interest of Borrower who assumes Borrower's obligations under this Security Instrument in writing, and is approved by Lender, shall obtain all of Borrower's rights and benefits under this Security Instrument. Borrower shall not be released from Borrower's obligations and liability under this Security Instrument unless Lender agrees to such release in writing. The covenants and agreements of this Security Instrument shall bind (except as provided in Section 20) and benefit the successors and assigns of Lender.

**14. Loan Charges.** Lender may charge Borrower fees for services performed in connection with Borrower's default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, including, but not limited to, attorneys' fees, property inspection and valuation fees. In regard to any other fees, the absence of express authority in this Security Instrument to charge a specific fee to Borrower shall not be construed as a prohibition on the charging of such fee. Lender may not charge fees that are expressly prohibited by this Security Instrument or by Applicable Law.

If the Loan is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the Loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower. Lender may choose to make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge (whether or not a prepayment charge is provided for under the Note). Borrower's acceptance of any such refund made by direct payment to Borrower will constitute a waiver of any right of action Borrower might have arising out of such overcharge.

**15. Notices.** All notices given by Borrower or Lender in connection with this Security Instrument must be in writing. Any notice to Borrower in connection with this Security Instrument shall be deemed to have been given to Borrower when mailed by first class mail or when actually delivered to Borrower's notice address if sent by other means. Notice to any one Borrower shall constitute notice to all Borrowers unless Applicable Law expressly requires otherwise. The notice address shall be the Property Address unless Borrower has designated a substitute notice address by notice to Lender. Borrower shall promptly notify Lender of Borrower's change of address. If Lender specifies a procedure for reporting Borrower's change of address, then Borrower shall only report a change of address through that specified procedure. There may be only one designated notice address under this Security Instrument at any one time. Any notice to Lender shall be given by delivering it or by mailing it by first class mail to Lender's address stated herein unless Lender has designated another address by notice to Borrower. Any notice in connection with this Security Instrument shall not be deemed to have been given to Lender until actually received by Lender. If any notice required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument.

 -6A(CA) (0207)                          Page 10 of 15                          Form 3005  1/01

31

**16. Governing Law; Severability; Rules of Construction.** This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located. All rights and obligations contained in this Security Instrument are subject to any requirements and limitations of Applicable Law. Applicable Law might explicitly or implicitly allow the parties to agree by contract or it might be silent, but such silence shall not be construed as a prohibition against agreement by contract. In the event that any provision or clause of this Security Instrument or the Note conflicts with Applicable Law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision.

As used in this Security Instrument: (a) words of the masculine gender shall mean and include corresponding neuter words or words of the feminine gender; (b) words in the singular shall mean and include the plural and vice versa; and (c) the word "may" gives sole discretion without any obligation to take any action.

**17. Borrower's Copy.** Borrower shall be given one copy of the Note and of this Security Instrument.

**18. Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

**19. Borrower's Right to Reinstate After Acceleration.** If Borrower meets certain conditions, Borrower shall have the right to have enforcement of this Security Instrument discontinued at any time prior to the earliest of: (a) five days before sale of the Property pursuant to any power of sale contained in this Security Instrument; (b) such other period as Applicable Law might specify for the termination of Borrower's right to reinstate; or (c) entry of a judgment enforcing this Security Instrument. Those conditions are that Borrower: (a) pays Lender all sums which then would be due under this Security Instrument and the Note as if no acceleration had occurred; (b) cures any default of any other covenants or agreements; (c) pays all expenses incurred in enforcing this Security Instrument, including, but not limited to, reasonable attorneys' fees, property inspection and valuation fees, and other fees incurred for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument; and (d) takes such action as Lender may reasonably require to assure that Lender's interest in the Property and rights under this Security Instrument, and Borrower's obligation to pay the sums secured by this Security Instrument, shall continue unchanged. Lender may require that Borrower pay such reinstatement sums and expenses in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality or entity; or (d) Electronic Funds Transfer. Upon reinstatement by Borrower, this Security Instrument and obligations secured hereby shall remain fully effective as if no acceleration had occurred. However, this right to reinstate shall not apply in the case of acceleration under Section 18.

**20. Sale of Note; Change of Loan Servicer; Notice of Grievance.** The Note or a partial interest in the Note (together with this Security Instrument) can be sold one or more times without prior notice to Borrower. A sale might result in a change in the entity (known as the "Loan Servicer") that collects Periodic Payments due under the Note and this Security Instrument and performs other mortgage loan servicing obligations under the Note, this Security Instrument, and Applicable Law. There also might be one or more changes of the Loan Servicer unrelated to a sale of the Note. If there is a change of the Loan Servicer, Borrower will be given written notice of the change which will state the name and address of the new Loan Servicer, the address to which payments should be made and any other information RESPA

requires in connection with a notice of transfer of servicing. If the Note is sold and thereafter the Loan is serviced by a Loan Servicer other than the purchaser of the Note, the mortgage loan servicing obligations to Borrower will remain with the Loan Servicer or be transferred to a successor Loan Servicer and are not assumed by the Note purchaser unless otherwise provided by the Note purchaser.

Neither Borrower nor Lender may commence, join, or be joined to any judicial action (as either an individual litigant or the member of a class) that arises from the other party's actions pursuant to this Security Instrument or that alleges that the other party has breached any provision of, or any duty owed by reason of, this Security Instrument, until such Borrower or Lender has notified the other party (with such notice given in compliance with the requirements of Section 15) of such alleged breach and afforded the other party hereto a reasonable period after the giving of such notice to take corrective action. If Applicable Law provides a time period which must elapse before certain action can be taken, that time period will be deemed to be reasonable for purposes of this paragraph. The notice of acceleration and opportunity to cure given to Borrower pursuant to Section 22 and the notice of acceleration given to Borrower pursuant to Section 18 shall be deemed to satisfy the notice and opportunity to take corrective action provisions of this Section 20.

**21. Hazardous Substances.** As used in this Section 21: (a) "Hazardous Substances" are those substances defined as toxic or hazardous substances, pollutants, or wastes by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials; (b) "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection; (c) "Environmental Cleanup" includes any response action, remedial action, or removal action, as defined in Environmental Law; and (d) an "Environmental Condition" means a condition that can cause, contribute to, or otherwise trigger an Environmental Cleanup.

Borrower shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances, or threaten to release any Hazardous Substances, on or in the Property. Borrower shall not do, nor allow anyone else to do, anything affecting the Property (a) that is in violation of any Environmental Law, (b) which creates an Environmental Condition, or (c) which, due to the presence, use, or release of a Hazardous Substance, creates a condition that adversely affects the value of the Property. The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal residential uses and to maintenance of the Property (including, but not limited to, hazardous substances in consumer products).

Borrower shall promptly give Lender written notice of (a) any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower has actual knowledge, (b) any Environmental Condition, including but not limited to, any spilling, leaking, discharge, release or threat of release of any Hazardous Substance, and (c) any condition caused by the presence, use or release of a Hazardous Substance which adversely affects the value of the Property. If Borrower learns, or is notified by any governmental or regulatory authority, or any private party, that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, Borrower shall promptly take all necessary remedial actions in accordance with Environmental Law. Nothing herein shall create any obligation on Lender for an Environmental Cleanup.

33

NON-UNIFORM COVENANTS. Borrower and Lender further covenant and agree as follows:

**22. Acceleration; Remedies.** Lender shall give notice to Borrower prior to acceleration following Borrower's breach of any covenant or agreement in this Security Instrument (but not prior to acceleration under Section 18 unless Applicable Law provides otherwise). The notice shall specify: (a) the default; (b) the action required to cure the default; (c) a date, not less than 30 days from the date the notice is given to Borrower, by which the default must be cured; and (d) that failure to cure the default on or before the date specified in the notice may result in acceleration of the sums secured by this Security Instrument and sale of the Property. The notice shall further inform Borrower of the right to reinstate after acceleration and the right to bring a court action to assert the non-existence of a default or any other defense of Borrower to acceleration and sale. If the default is not cured on or before the date specified in the notice, Lender at its option may require immediate payment in full of all sums secured by this Security Instrument without further demand and may invoke the power of sale and any other remedies permitted by Applicable Law. Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this Section 22, including, but not limited to, reasonable attorneys' fees and costs of title evidence.

If Lender invokes the power of sale, Lender shall execute or cause Trustee to execute a written notice of the occurrence of an event of default and of Lender's election to cause the Property to be sold. Trustee shall cause this notice to be recorded in each county in which any part of the Property is located. Lender or Trustee shall mail copies of the notice as prescribed by Applicable Law to Borrower and to the other persons prescribed by Applicable Law. Trustee shall give public notice of sale to the persons and in the manner prescribed by Applicable Law. After the time required by Applicable Law, Trustee, without demand on Borrower, shall sell the Property at public auction to the highest bidder at the time and place and under the terms designated in the notice of sale in one or more parcels and in any order Trustee determines. Trustee may postpone sale of all or any parcel of the Property by public announcement at the time and place of any previously scheduled sale. Lender or its designee may purchase the Property at any sale.

Trustee shall deliver to the purchaser Trustee's deed conveying the Property without any covenant or warranty, expressed or implied. The recitals in the Trustee's deed shall be prima facie evidence of the truth of the statements made therein. Trustee shall apply the proceeds of the sale in the following order: (a) to all expenses of the sale, including, but not limited to, reasonable Trustee's and attorneys' fees; (b) to all sums secured by this Security Instrument; and (c) any excess to the person or persons legally entitled to it.

**23. Reconveyance.** Upon payment of all sums secured by this Security Instrument, Lender shall request Trustee to reconvey the Property and shall surrender this Security Instrument and all notes evidencing debt secured by this Security Instrument to Trustee. Trustee shall reconvey the Property without warranty to the person or persons legally entitled to it. Lender may charge such person or persons a reasonable fee for reconveying the Property, but only if the fee is paid to a third party (such as the Trustee) for services rendered and the charging of the fee is permitted under Applicable Law. If the fee charged does not exceed the fee set by Applicable Law, the fee is conclusively presumed to be reasonable.

**24. Substitute Trustee.** Lender, at its option, may from time to time appoint a successor trustee to any Trustee appointed hereunder by an instrument executed and acknowledged by Lender and recorded in the office of the Recorder of the county in which the Property is located. The instrument shall contain the name of the original Lender, Trustee and Borrower, the book and page where this Security Instrument is recorded and the name and address of the successor trustee. Without conveyance of the Property, the successor trustee shall succeed to all the title, powers and duties conferred upon the Trustee herein and by Applicable Law. This procedure for substitution of trustee shall govern to the exclusion of all other provisions for substitution.

**25. Statement of Obligation Fee.** Lender may collect a fee not to exceed the maximum amount permitted by Applicable Law for furnishing the statement of obligation as provided by Section 2943 of the Civil Code of California.

 -6A(CA) (0207)                              Page 13 of 15                              Form 3005   1/01

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Security Instrument and in any Rider executed by Borrower and recorded with it.

Witnesses:

_____                    _____ (Seal)
                                                    MARTHA E. CHAMBERLIN-LOMBARDO Borrower

_____                    _____ (Seal)
                                                                                   -Borrower

_____ (Seal)             _____ (Seal)
                     -Borrower                                                      -Borrower

_____ (Seal)             _____ (Seal)
                     -Borrower                                                      -Borrower

_____ (Seal)             _____ (Seal)
                     -Borrower                                                      -Borrower

**State of California**
**County of**                                                        } ss.

On                                    before me,

                                                                    personally appeared

                                                            , personally known to me
(or proved to me on the basis of satisfactory evidence) to be the person(s) whose name(s) is/are subscribed
to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their
authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s) or the entity
upon behalf of which the person(s) acted, executed the instrument.

WITNESS my hand and official seal.

_____(Seal)

VMP-6A(CA) (0207)                    Page 15 of 15                    Form 3005  1/01

LOAN NO.  ███████4636

# Interest Only Adjustable Rate Rider

( ONE YEAR   LIBOR Index (As Published in *The Wall Street Journal*) – Rate Caps)

THIS ADJUSTABLE RATE RIDER is made this 20TH  day of    DECEMBER          ,
2005 , and is incorporated into and shall be deemed to amend and supplement the Mortgage, Deed of Trust, or
Deed to Secure Debt (the "Security Instrument") of the same date given by the undersigned (the "Borrower") to
secure Borrower's Note to   AMERICAN MORTGAGE NETWORK, INC., A DELAWARE CORPORATION

(the "Lender") of the same date and covering the property described in the Security Instrument and located at:

2541 STANTON AVENUE, LA HABRA, CALIFORNIA 90631

[Property Address]

THE NOTE CONTAINS PROVISIONS ALLOWING FOR CHANGES IN
MY INTEREST RATE AND MY MONTHLY PAYMENT. THIS NOTE
LIMITS THE AMOUNT MY ADJUSTABLE INTEREST RATE CAN
CHANGE AT ANY ONE TIME AND THE MAXIMUM RATE I MUST
PAY.

ADDITIONAL COVENANTS.  In addition to the covenants and agreements made in the Security
Instrument, Borrower and Lender further covenant and agree as follows:

## A.  INTEREST RATE AND MONTHLY PAYMENT CHANGES

The Note provides for an initial interest rate of  6.375  %.  The Note provides for changes in the interest rate
and monthly payments, as follows:

"3.     PAYMENTS
   (A) Time and Place of Payments
   I will make a payment on the  1ST day of every month, beginning on FEBRUARY 01, 2006  .
Before the First Principal and Interest Payment Due Date as described in Section 4 of this Note, my payment will
consist only of the interest due on the unpaid principal balance of this Note. Thereafter, I will pay principal and
interest by making a payment every month as provided below.
   I will make my monthly payments of principal and interest beginning on the First Principal and Interest
Payment Due Date as described in Section 4 of this Note. I will make these payments every month until I have paid
all of the principal and interest and any other charges described below that I may owe under this Note. Each
monthly payment will be applied as of its scheduled due date, and if the payment includes both principal and
interest, it will be applied to interest before Principal. If, on   JANUARY 01, 2036 , I still owe amounts
under this Note, I will pay those amounts in full on that date, which is called the "Maturity Date."
   I will make monthly payments at  P. O. BOX 85302
                                     SAN DIEGO, CA 92186

12/27/04                        Page 1 of 3                         ACST368

368ST

LOAN NO. ▬▬4636

or at a different place if required by the Note Holder.

**(B) Amount of My Monthly Payments**

My initial monthly payments will be in the amount of U.S. $   2,045.31. This amount may change with the first monthly payment after the first Change Date and the first monthly payment after every Change Date thereafter. Each of these payments will be in an amount sufficient to pay the interest due on the unpaid principal balance at the rate determined as described in Section 4 of this Note. However, starting with the First Principal and Interest Payment Due Date, my monthly payments will be in an amount sufficient to repay the principal and interest at the rate determined as described in Section 4 of this Note in substantially equal installments by the Maturity Date. The Note Holder will notify me prior to the date of change in monthly payment.

**(C) Monthly Payment Changes**

Changes in my monthly payment will reflect changes in the unpaid principal of my loan and in the interest rate that I must pay. The Note Holder will determine my new interest rate and the changed amount of my monthly payment in accordance with Section 4 of this Note.

4.    **ADJUSTABLE INTEREST RATE AND MONTHLY PAYMENT CHANGES**

**(A) Change Dates**

The initial fixed interest rate I will pay will change to an adjustable interest rate on the first day of JANUARY    , 2011, and the adjustable interest rate I will pay may change on that day every TWELFTH month thereafter. The date on which my initial fixed interest rate changes to an adjustable interest rate, and each date on which my adjustable interest rate could change, is called a "Change Date."

**(B) The Index**

Beginning with the first Change Date, my interest rate will be based on an Index. The "Index" is the average of interbank offered rates for ONE YEAR    U.S. dollar-denominated deposits in the London market ("LIBOR"), as published in *The Wall Street Journal*. The most recent Index figure available as of    45   days before the Change Date is called the "Current Index."

If the Index is no longer available, the Note Holder will choose a new index that is based upon comparable information. The Note Holder will give me notice of this choice.

**(C) Calculation of Changes**

Before each Change Date, the Note Holder will calculate my new interest rate by adding TWO AND 250/1000            percentage points (    2.250  %) to the Current Index. The Note Holder will then round the result of this addition to the nearest one-eighth of one percentage point (0.125%). Subject to the limits stated in Section 4 (D) below, this rounded amount will be my new interest rate until the next Change Date.

For each Change Date until the Change Date immediately prior to the First Principal and Interest Payment Due Date, the Note Holder will determine the amount of the monthly payment that would be sufficient to pay only the interest on the unpaid principal that I am expected to owe at the Change Date as it accrues. The result of this calculation will be the new amount of my monthly payment. For each Change Date beginning with the Change Date immediately prior to the First Principal and Interest Payment Due Date, and for each Change Date thereafter, the Note Holder will then determine the amount of monthly payment that would be sufficient to repay the unpaid principal that I am expected to owe at the Change Date in full on the Maturity Date at my new interest rate in substantially equal payments. The result of this calculation will be the new amount of my monthly payment.

**(D) Limits on Interest Rate Changes**

The interest rate I am required to pay at the first Change Date will not be greater than 12.375   % or less than   2.250      %. Thereafter, my interest rate will never be increased or decreased on any single Change Date by more than TWO AND 000/1000          percentage point(s) (   2.000   %) from the rate of interest I have been paying for the preceding  12   months. My interest rate will never be greater than    12.375        % or less than    2.250     %.

38

LOAN NO. ████4636

**(E) Effective Date of Changes**
My new interest rate will become effective on each Change Date. I will pay the amount of my new monthly payment beginning on the first monthly payment date after the Change Date until the amount of my monthly payment changes again.

**(F) Notice of Changes**
Before the effective date of any change in my interest rate and/or monthly payment, the Note Holder will deliver or mail to me a notice of such change. The notice will include information required by law to be given to me and also the title and telephone number of a person who will answer any question I may have regarding the notice.

**(G) Date of First Principal and Interest Payment**
The date of my first payment consisting of both principal and interest on this Note (the "First Principal and Interest Payment Due Date") shall be the first monthly payment date after    JANUARY 01, 2016    ."

_____ (Seal)
MARTHA E. CHAMBERLIN-LOMBARDO          -Borrower

_____ (Seal)
                                       -Borrower

_____ (Seal)
                                       -Borrower

_____ (Seal)
                                       -Borrower

# EXHIBIT "C"

 IndyMac Mortgage Services,

Primary Phone Number: ▓▓▓▓▓
Secondary Phone Number: ▓▓▓▓▓

**Property Address:** 2541 STANTON AVENUE,
LA HABRA, CA 90631

119500 RE

#BWNDXCT
#6684251607001079#

MARTHA E CHAMBERLIN-LOMBARDO
2541 Stanton Avenue
LA HABRA   CA   90631-5040

‖|l‖l‖‖‖‖l‖‖l‖l‖‖l‖l‖‖l‖‖l‖‖l‖l‖l‖‖l‖l‖l‖l‖l

| Account Information | |
| --- | --- |
| Account Information as of | 07/20/09 |
| Loan Number | ▓▓▓▓ |
| Interest Rate | 6.375% |
| Principal Balance | $385,000.00 |
| Escrow Balance | $102.25 |
| Unapplied Funds | $ .00 |
| Funds Advanced by IMS (1,2) | $78.00 |
| Principal Paid YTD | $ .00 |
| Interest Paid YTD | $8,181.24 |
| Property Taxes Paid YTD | $ .00 |
| Hazard Insurance Paid YTD | $ .00 |

**For statement questions,
please call Customer Service at
1.800.781.7399**

## Payment Information

| 08/01/09 Payment Options | Interest Only |
| --- | --- |
| Principal and/or Interest | $2,045.31 |
| Escrow | $188.38 |
| Optional Products (2) | $ .00 |
| Other (2) | $ .00 |
| **Payment Amount** | $2,233.69 |
| Past Due Payment(s) | $8,942.16 |
| Total Payments Due | $11,175.85 |
| Unpaid Late Charges | $511.35 |
| Returned Payment Fees | $ .00 |
| Other Unpaid Charges (2) | $ .00 |
| Funds Advanced by IMS (1,2) | $78.00 |
| **Total Amount Due** | $11,765.20 |
| After 08/16/09 please pay: (3) | $11,867.47 |

**Your Account is
Past Due.**

### Additional Information

1. Unless otherwise agreed upon, additional funds may be applied to advances prior to being applied to fees/charges.

2. Itemized detail available upon request.

3. Payment calculation includes Late Charge fee.

### Transactions Since Last Statement

| Date | Transaction | Total | Principal/Deferred Interest | Interest | Escrow | Fees/Misc |
| --- | --- | --- | --- | --- | --- | --- |
| 07/16/09 | Fee Assessment | | | | | 102.27- |

### Important Messages

**ONLINE ACCESS TO YOUR LOAN INFORMATION IS JUST A CLICK AWAY!**
To find out more, see the back of this statement.

# EXHIBIT "D"

Recording Requested By:
AMERICAN MORTGAGE NETWORK,
INC
4100 NEWPORT PLACE SUITE #600
NEWPORT   BEACH,   CALIFORNIA
92660
After Recording Return To:
AMERICAN MORTGAGE NETWORK,
INC
4100 NEWPORT PLACE SUITE #600
NEWPORT BEACH, CALIFORNIA
92660

Prepared By:
AMERICAN MORTGAGE  NETWORK, INC  4100  NEWPORT PLACE SUITE #600 NEWPORT
BEACH, CALIFORNIA 92660

———————————————————— [Space Above This Line For Recording Data] ————————————————

DOC ID #:  225-324741

## DEED OF TRUST AND ASSIGNMENT OF RENTS

CHL #: 116576541

MIN   100131022503247417

This deed of trust secures an obligation which calls for payment of interest at a variable interest rate.
THIS DEED OF TRUST is made this       20TH            day of DECEMBER, 2005     , between

**Martha E. Chamberlin-Lombardo, A MARRIED WOMAN**

herein called "Trustor,"
LAWYERS TITLE COMPANY
2090 NORTH TUSTIN AVE., #200 SANTA ANA, CA 92705

herein called "Trustee," and "Mortgage Electronic Registration Systems, Inc. ("MERS"), (solely as
nominee for
**AMERICAN MORTGAGE NETWORK, INC**

(hereinafter "you" or "Lender" and Lender's successors and assigns.) MERS is organized and existing
under the laws of Delaware, and has an address and telephone number of P.O. Box 2026, Flint, MI
48501-2026, tel. (888) 679-MERS, herein called "Beneficiary."

Trustor irrevocably grants, transfers and assigns to Trustee, in trust and with power of sale, all of the real
property in the City or Town of       La Habra                              , County of
Orange                                , State of California, having the street address of
**2541 Stanton Avenue, La Habra, CALIFORNIA 90631**
and more specifically described as:

HELOC - CA Deed of Trust with MERS              Page 1 of 10                    Initials:_____
FE-4331(CA) (0204)              VMP FORMSEDGE - (800)635-4111                    4/00
PLATINUM/GMD

**LEGAL DESCRIPTION ATTACHED HERETO AND MADE A PART HEREOF**

Parcel ID Number:    **018-221-06**                    together with all improvements now or hereafter erected on the property, and all easements, rights, appurtenances, rents (subject however to the rights and authorities given herein to Beneficiary to collect and apply such rents), royalties, mineral, oil and gas rights and profits, water, water rights, and water stock, and all fixtures now or hereafter attached to the property, all of which, including replacements and additions thereto, shall be deemed to be and remain a part of the property covered by this deed of trust; and all of the foregoing, together with said property (or the leasehold estate if this deed of trust is on a leasehold) are herein referred to as the "Property." Borrower understands and agrees that MERS holds only legal title to the interests granted by Borrower in this Deed of Trust; but, if necessary to comply with law or custom, MERS, (as nominee for Lender and Lender's successors and assigns), has the right: to exercise any or all of those interests, including, but not limited to, the right to foreclose and sell the Property; and to take any action required of Lender including, but not limited to, releasing or canceling this Deed of Trust.

1.      THIS DEED OF TRUST SECURES:

    a.    All of the obligations of Trustor in favor of Beneficiary or order under the terms of a revolving credit agreement dated **DECEMBER 20, 2005**        , herein called Agreement. The Agreement provides, among other things, for the payment of all sums advanced by Beneficiary from time to time pursuant to the Agreement and for the payment of interest. The maximum principal obligation under the Agreement to be secured by this deed of trust at any one time is **ONE HUNDRED TEN THOUSAND AND 00/100ths**
    Dollars ($ **110,000.00**        ) unless Beneficiary, with Trustor's written consent, hereafter increases this amount. Advances made by Beneficiary to protect the security of this deed of trust or to preserve the Property shall not be subject to the limitation of the preceding sentence.

    The security of this deed of trust shall not be affected by the extension, renewal or modification from time to time of the obligations, instruments or agreements described above.

    b.    Payment of any and all obligations and liabilities, whatsoever, whether primary, secondary, direct, indirect, fixed or contingent, whether now or hereafter due from Trustor (or any successor in interest to Trustor) whether created directly or acquired by assignment if the document evidencing such obligation or liability or any other writing signed by Trustor (or any successor in interest to Trustor) specifically provides that said obligation or liability is secured by this deed of trust.

    c.    Performance of each agreement of Trustor herein contained or contained in any other agreement, instrument or other writing to which Trustor is a party if the same is written in connection with any of the foregoing.

FE-4331(CA) (0204)                    Page 2 of 10                    Initials:_____

d.    Payment of all sums to be expended by the Beneficiary or Trustee pursuant to the terms hereof.

2.    **TO PROTECT THE SECURITY OF THIS DEED OF TRUST, TRUSTOR AGREES:**

a.    To keep the Property in good condition and repair; not to remove or demolish any building or improvement thereon; to complete or cause to be completed any construction of buildings or other improvements thereon which are financed in whole or in part by the indebtedness secured hereby and to restore promptly and in good and workmanlike manner any building or other improvement which may be damaged or destroyed thereon and to pay when due all claims for labor performed and materials furnished therefor; to comply with all laws affecting the Property or requiring any alteration or improvements to be made thereon; not to commit or permit waste thereof; not to commit, suffer or permit any act upon said property in violation of law; to cultivate, irrigate, weed, fertilize, fumigate, spray, prune and do all other acts which from the character or use of the Property may be reasonably necessary, the specific enumerations herein not excluding the general.

b.    To provide, maintain and deliver to Beneficiary fire and other insurance on the Property satisfactory to and with loss payable to Beneficiary. The amount collected under any fire or other insurance policy may be applied by Beneficiary upon indebtedness secured hereby and in such order as Beneficiary may determine, or at option of Beneficiary, the entire amount so collected or any part thereof may be released to Trustor. Such application or release shall not cure or waive any default hereunder or invalidate any act done pursuant to such notice.

c.    To appear in and defend any action or proceeding purporting to affect the security hereof or the rights or powers of Beneficiary or Trustee; and to pay all costs and expenses, including cost of evidence of title and attorney's fees in a reasonable sum, in any such action or proceeding in which Beneficiary or Trustee may appear, and in any suit brought by Beneficiary to foreclose this deed of trust.

d.    To pay at least ten days before delinquency all taxes and assessments affecting the Property, including, without limitation, assessment on appurtenant water stock, all encumbrances, charges and liens on the Property or any part thereof, and all costs, fees and expenses of this Trust.

e.    That should Trustor fail to make any payment or do any act as herein provided, then Beneficiary or Trustee, but without obligation so to do and without notice to or demand upon Trustor and without releasing Trustor from any obligation hereof, may:

(1)    Make or do the same in such manner and to such extent as either may deem necessary or appropriate to protect the security hereof, Beneficiary or Trustee being authorized to enter upon the Property for such purposes.

(2)    Appear in and defend any action or proceeding purporting to affect the security hereof or the rights or power of Beneficiary or Trustee.

(3)    Pay, purchase, contest or compromise any encumbrance, charge or lien which in the judgment of either appears to be prior and superior hereto.

(4)    In exercising any such powers, pay necessary expenses, employ counsel and pay his or her reasonable fees.

f.    To pay immediately and without demand all sums so expended by Beneficiary or Trustee, with interest from date of expenditure at the maximum rate allowed by law in effect at the date hereof or at the option of Beneficiary, such sums may be added to the principal balance of any indebtedness secured hereby and shall bear the highest rate of interest as any such indebtedness.

g.    To pay for any statement provided for by the law in effect on the date hereof regarding the obligation secured hereby in the amount demanded by the Beneficiary but not to exceed the maximum allowed by law at the time the statement is demanded.

3.    IT IS FURTHER AGREED THAT:

a.    Any award of damages in connection with any condemnation for public use of or injury to the Property or any part thereof is hereby assigned and shall be paid to Beneficiary who may apply or release such monies received by him in the same manner and with the same effect as above provided for disposition of proceeds of fire or other insurance.

b.    By accepting payment of any sum secured hereby after its due date, or after the filing of notice of default and of election to sell, Beneficiary shall not waive its right to require prompt payment when due of all other sums so secured, or to declare default for failure so to pay, or to proceed with the sale under any such notice of default and of election to sell, for any unpaid balance of said indebtedness. If Beneficiary holds any additional security for any obligation secured hereby, it may enforce the sale thereof at its option, either before, contemporaneously with, or after the sale is made hereunder, and on any default of Trustor, Beneficiary may, at its option, offset against any indebtedness owing by it to Trustor, the whole or any part of the indebtedness secured hereby.

c.    Without affecting the liability of any person, including, without limitation, Trustor, for the payment of any indebtedness secured hereby, or the lien of this deed of trust on the remainder of the Property for the full amount of any indebtedness unpaid, Beneficiary and Trustee are respectively empowered as follows:

(1)   Beneficiary may from time to time and without notice (a) release any person liable for the payment of any of the indebtedness, (b) extend the time or otherwise alter the terms of payment of any of the indebtedness, (c) accept additional security therefor of any kind, including deeds of trust or mortgages, (d) alter, substitute or release any of the Property securing the indebtedness.

(2)   Trustee may, at any time, and from time to time, upon the written request of Beneficiary (a) consent to the making of any map or plat of the Property, (b) join in granting any easement or creating any restriction thereon, (c) join in any subordination or other agreement affecting this deed of trust or the lien or charge thereof or, (d) reconvey, without any warranty, all or any part of the Property.

d.    Upon (a) written request of Beneficiary or (b) performance of all obligations of the Trustor hereunder and under each and every note, guarantee, Agreement or other writing evidencing the indebtedness secured hereby, and upon surrender of this deed of trust to Trustee for cancellation and retention and upon payment of its fees, Trustee shall reconvey, without warranty, the Property then held hereunder. The recital in such reconveyance of any matters of facts shall be conclusive proof of the truthfulness thereof. The grantee in such reconveyance may be described

as "the person or persons legally entitled thereto." Five years after issuance of such reconveyance, Trustee may destroy said note, guarantee, Agreement or other evidence of indebtedness and this deed of trust (unless directed in such request to retain them).

e.    Trustor hereby gives to and confers upon Beneficiary the right, power and authority during the continuance of these trusts to collect the rents, issues and profits of the Property and of any personal property located thereon, and hereby absolutely and unconditionally assigns all such rents, issues and profits to Beneficiary; provided, however, that Beneficiary hereby consents to the collection and retention of such rents, issues and profits as they accrue and become payable only if Trustor is not, at such time, in default with respect to payment of any indebtedness secured hereby or in the performance of any agreement hereunder. Upon any such default, Beneficiary may at any time, without notice, either in person, by agent, or by a receiver to be appointed by a court, without regard to the adequacy of any security for the indebtedness hereby secured and without limiting the generality of Section 2.e.(1), above, enter upon and take possession of the Property or any part thereof, and in its own name sue for or otherwise collect such rents, issues and profits, including those past due and unpaid, and apply the same, less costs and expenses of operation and collection, including reasonable attorney's fees, upon any indebtedness secured hereby, and in such order as Beneficiary may determine; also perform such acts of repair, nurturing, cultivation, irrigation, weeding, fertilizing, fumigation, spraying, pruning or protection, as may be necessary or proper to conserve the value of the Property or any trees, planting or crops growing thereon; also lease the same or any part thereof for such rental, term, and upon such conditions as its judgment may dictate; also prepare for harvest, sever, remove, and sell any crops that may be growing upon the premises, and apply the net proceeds thereof to the indebtedness secured hereby. The entering upon and taking possession of the Property and performance or failure to perform any of the acts described in the preceding sentence, the collection of or failure to collect such rents, issues and profits, and the application thereof as aforesaid, shall not waive or cure any default or notice of default hereunder, or invalidate any act done pursuant to such notice and shall not constitute or otherwise result in any assumption by or liability of Beneficiary for maintenance, depreciation, misuse or risk of loss other than for damage or loss to the Property due to Beneficiary's gross negligence or intentional torts. Trustor also assigns to Trustee, as further security for the performance of the obligations secured hereby, all prepaid rents and all monies which may have been or may hereafter be deposited with said Trustor by any lessee of the premises herein described, to secure the payment of any rent, and upon default in the performance of any of the provisions hereof, Trustor agrees to deliver such rents and deposits to the Trustee.

f.    Upon default by Trustor in the performance of any payment or other obligation secured hereby or in the performance of any agreement hereunder, or if, whether voluntarily or involuntarily, there is a sale or transfer of all or any part of (i) the Property or an interest therein, or (ii) a beneficial interest in Trustor and Trustor is not a natural person, or if Trustor ceases to use the Property as Trustor's primary residence, Beneficiary may declare all sums secured hereby immediately due without notice or demand and no waiver of this right shall be effective unless in writing and signed by Beneficiary.

g.    Waiver of a right granted to Beneficiary hereunder as to one transaction or occurrence shall not be deemed to be a waiver of the right as to any subsequent transaction or occurrence. Beneficiary may rescind any notice before Trustee's sale by executing a notice of rescission and recording the same. The recordation of such notice shall constitute also a cancellation of any prior declaration of default and demand for sale, and of any acceleration of maturity of indebtedness

affected by any prior declaration or notice of default. The exercise by Beneficiary of the right of rescission shall not constitute a waiver of any default then existing or subsequently occurring, nor impair the right of the Beneficiary to execute other declarations of default and demand for sale, or notices of default and of election to cause the Property to be sold, nor otherwise affect the note or deed of trust, or any of the rights, obligations or remedies of the Beneficiary or Trustee hereunder.

h.    At least three months or any lesser period required by law having elapsed between the recordation of the notice of default and the date of sale, Trustee, having first given notice of sale as then required by law, shall sell the Property at the time and place of sale fixed by it in the notice of sale, either as a whole or in separate parcels, and in such order as the Trustee may determine, at public auction to the highest bidder for cash, in lawful money of the United State of America, payable at the time of sale except as otherwise permitted by law. Trustee may postpone sale of all or any portion of the Property by public announcement at the time of sale, and from time to time thereafter may postpone the sale by public announcement, all as permitted by law. Trustee shall deliver to the purchaser its deed conveying the Property so sold, but without any covenant or warranty, expressed or implied. The recital in any such deed of any matters or facts, stated either specifically or in general terms, or as conclusions of law or fact, shall be conclusive proof of the truthfulness thereof. Any person, including Trustor, Trustee or Beneficiary, may purchase at the sale. After deducting all costs, fees and expenses of Trustee and of this trust, including costs of evidence of title in connection with the sale, the Trustee shall apply the proceeds of this sale to the payment of all sums then secured hereby, in such order and manner as may be required by the Beneficiary; the remainder, if any, to be paid to the person or persons legally entitled thereto. If Beneficiary shall elect to bring suit to foreclose this deed of trust in the manner and subject to the provisions, rights and remedies relating to the foreclosure of a mortgage, Beneficiary shall be entitled to reasonable attorney's fees and litigation costs.

i.    Beneficiary, or any successor in ownership of any indebtedness secured hereby, may from time to time, by instrument in writing, substitute a successor or successors to any Trustee named herein or acting hereunder, which instrument, executed by the Beneficiary and duly acknowledged and recorded in the office of the recorder of the county or counties where said property is situated, shall be conclusive proof of proper substitution of such successor Trustee or Trustees, who shall, without conveyance from the Trustee predecessor, succeed to all its title, estate, rights, powers and duties. Said instrument must contain the name of the original Trustor, Trustee and Beneficiary hereunder, the book and page where this deed of trust is recorded and the name and address of the new Trustee.

j.    This deed of trust applies to, inures to the benefit of, and binds all parties hereto, their heirs, legatees, devisees, administrators, executors, successors and assigns. The term Beneficiary shall mean the owner and holder, including, without limitation, pledgees, of the note, guarantee, Agreement, or other evidence of indebtedness secured hereby, whether or not named as Beneficiary herein. In this deed of trust, whenever the context so requires, the singular number includes the plural.

k.    Trustee accepts this Trust when this deed of trust, duly executed and acknowledged, is made a public record as provided by law. Trustee is not obligated to notify any party hereto of pending sale under any other deed of trust or of any action or proceeding in which Trustor, Beneficiary or Trustee shall be a party unless brought by Trustee.

l.    If Trustor or any successor in interest to Trustor sells, transfers or encumbers any interest in the Property, whether voluntarily or involuntarily, or if a beneficial interest in Trustor is sold or transferred, voluntarily or involuntarily, and Trustor is not a natural person: (a) the transferor and the transferee shall each immediately give written notice of said transfer to the Beneficiary, at its address designated on the first page of this deed of trust; (b) if the deed of trust secures Trustor's obligation under an Agreement as defined herein, all credit extended by Beneficiary under the Agreement, whether before or after the property is transferred, shall be secured under this deed of trust as if no transfer had occurred except for credit extended by Beneficiary more than five days after it has received the written notices required by this paragraph.

m.    The pleading of any statute of limitations as a defense to any and all obligations secured by this deed of trust is hereby waived to the full extent permitted by law.

4.    WITH REGARD TO ENVIRONMENTAL LAWS AND HAZARDOUS SUBSTANCES, TRUSTOR AGREES:

a.    As used in this Paragraph 4:

(1) "Environmental Law" means all federal, state and local law concerning the public health, safety or welfare, environment or a Hazardous Substance, including without limitation, the Comprehensive Environmental Response, Compensation and Liability Act, 42 U.S.C. Sec. 9601 et seq., Resource Conservation and Recovery Act, 42 U.S.C. Sec. 6901 et seq., Toxic Substances Control Act, 15 U.S.C. Sec. 2601 et seq., Hazardous Materials Transportation Act, 49 U.S.C. Sec. 1801 et seq., Clean Water Act and Water Quality Act of 1987, 33 U.S.C. Sec. 1251 et seq., Safe Drinking Water Act, 41 U.S.C. Sec. 300f et seq., Clean Air Act, 42 U.S.C. Sec. 7901 et seq., Carpenter-Presley-Tanner Hazardous Account Act, Cal.Health & Safety Code Sec. 25300 et seq., Hazardous Waste Control Law, Cal.Health & Safety Code Sec. 25100 et seq., Porter-Cologne Water Quality Control Act, Cal.Water Code Sec. 1300 et seq., Hazardous Waste Disposal Land Use Law, Cal.Health & Safety Code Sec. 25220 et seq., Safe Drinking Water and Toxic Enforcement Act of 1986, Cal.Health & Safety Code Sec. 25249.5 et seq., Hazardous Substances Underground Storage Tank Law, Cal.Health & Safety Code Sec. 25280 et seq., Air Resources Law, Cal.Health & Safety Code Sec. 3900 et seq., Hazardous Materials Release Response Plans and Inventory, Cal.Health & Safety Code Sec. 25500 et seq., and Toxic Pits Cleanup Act of 1984, Cal.Health & Safety Code Sec. 25208 et seq.

(2) "Hazardous Substance" means any substance which has characteristics of ignitability, corrosivity, toxicity, reactivity or radioactivity or other characteristics which render it dangerous or potentially dangerous to public health, safety or welfare or the environment, including without limitation, (i) petroleum or any fraction or other byproduct thereof, (ii) asbestos, (iii) lead, (iv) cyanide, (v) polychlorinated biphenyls, (vi) urea formaldehyde and (vii) anything defined as a "hazardous material," "toxic substance," "hazardous substance," "hazardous waste" or "waste" under any Environmental Law, including without limitation, "hazardous substance" as defined in Cal.Health & Safety Code Sec. 25316 and "waste" and "hazardous substance" as defined in Cal.Water Code Sec. 13050(d) and Sec. 13050(p)(l), respectively. The term is intended by Trustor and Beneficiary to be interpreted in its most comprehensive and cumulative sense.

b.    Trustor represents and warrants that except as disclosed to and acknowledged in writing by Beneficiary before the date of this deed of trust:

(1)   No Hazardous Substance has been located, used, manufactured, generated, treated, handled, stored, spilled, disposed of, discharged or released by any person on, under or about the Property.

(2)   Trustor has no knowledge of or reason to believe that there is any pending or threatened investigation, assessment, claim, demand, action or proceeding of any kind relating to (i) any alleged or actual Hazardous Substance located under or about the Property or (ii) alleged or actual violation or noncompliance by Trustor or any tenant of Trustor with regard to any Environmental Law involving the Property.

(3)   Neither Trustor nor any tenant of Trustor is required by any Environmental Law to obtain or maintain any permit, license, financial responsibility certificate or other approval as a condition to its business operations or in connection with its use, development or maintenance of the Property.

c.   Trustor represents and warrants that Trustor and every tenant of Trustor have been, are and will remain in full compliance with any Environmental Law applicable to its business operations and its use, development or maintenance of the Property.

d.   Trustor agrees to permit, or cause any tenant of Trustor to permit, Beneficiary to enter and inspect the Property at any reasonable time for purposes of determining, as Beneficiary deems necessary or desirable: (i) the existence, location and nature of any Hazardous Substance on, under or about the Property, (ii) the existence, location, nature, magnitude and spread of any Hazardous Substance that has been spilled, disposed of, discharged or released on, under or about the Property or (iii) whether or not Trustor and any tenant of Trustor are in compliance with applicable Environmental Law. If Trustor or its tenant fails to comply fully with the terms hereof, Beneficiary may obtain affirmative injunctive relief therefor.

e.   Trustor agrees to indemnify and hold Beneficiary and its successors or assigns harmless from and against all losses, claims, demands, liabilities, damages, cleanup, response and remediation costs, penalties and expenses, including, without limitation, all costs of litigation and attorneys' fees, which Beneficiary and its successors and assigns may directly or indirectly sustain or suffer as a consequence of any inaccuracy or breach of any representation, warranty or promise made in this deed of trust in connection with any Hazardous Substance or Environmental Law. Notwithstanding any of the language in the deed of trust to the contrary, this indemnity covers claims asserted after all the indebtedness secured by this deed of trust has been paid and discharged, whether or not the deed of trust has also been reconveyed to Trustor. The only exclusions hereto may relate to claims arising out of the affirmative acts of Beneficiary or of a third party after Trustor's interest in the Property has terminated.

f.   The provisions of this Paragraph 4 shall not be affected by the acquisition by Beneficiary or its successors or assigns of any ownership or other interest in the Property beyond Beneficiary's security interest in the Property created under this deed of trust, whether or not such acquisition is pursuant to the foreclosure of this deed of trust or a merger of the interest of the Beneficiary or its successors and assigns in the Property.

5 0

5.    ADDITIONAL PROVISIONS:

a.    The execution of this deed of trust by any person who has no present interest in the Property shall not be deemed to indicate that such an interest presently exists. Rather, execution of this deed of trust by such a person shall constitute such person's agreement that if such person hereafter acquires an interest in the Property, such interest shall be subject to Beneficiary's interest hereunder.

b.    The execution of this deed of trust by any person who has a present interest in the Property shall not in itself be deemed to indicate that such person is liable to Beneficiary for any obligation described in Section 1., above. Any personal liability of such person to Beneficiary shall be determined on an independent basis (such as execution of the document or documents evidencing the obligation described in Section 1., above). Execution of this deed of trust by any such person shall nevertheless indicate that such person's interest in the Property shall be subject to Beneficiary's interest hereunder.

The undersigned Trustors request that a copy of any notice of default, and of any notice of sale hereunder, be mailed to their respective addresses set forth opposite each signature.

By signing below, Trustor agrees to all the terms and conditions of this deed of trust.

Mailing Address For Notices

**2541 Stanton Avenue
La Habra, CALIFORNIA 90631**

_____

**Martha E. Chamberlin-Lombardo**

_____

_____

_____

FE-4331(CA) (0204)                    Page 9 of 10

State of California
County of    Orange
On                                              , before me
                                                                    , personally appeared

**Martha E. Chamberlin-Lombardo , A MARRIED WOMAN**

                                        , personally known to me (or proved to me on the basis
of satisfactory evidence) to be the person(s) whose name(s) is/are subscribed to the within instrument and
acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that
by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the
person(s) acted, executed the instrument.
    WITNESS my hand and official seal.

                                        _____

FE-4331(CA) (0204)                          Page 10 of 10

52

LOAN NO. ▓▓▓▓4636

# INTEREST ONLY ADJUSTABLE RATE NOTE
( ONE YEAR    LIBOR Index (As Published in *The Wall Street Journal*) – Rate Caps)

THIS NOTE CONTAINS PROVISIONS ALLOWING FOR CHANGES IN MY INTEREST RATE AND
MY MONTHLY PAYMENT. THIS NOTE LIMITS THE AMOUNT MY ADJUSTABLE INTEREST
RATE CAN CHANGE AT ANY ONE TIME AND THE MAXIMUM RATE I MUST PAY.

DECEMBER 20, 2005        LA HABRA                CALIFORNIA
          (Date)                    (City)              (State)

2541 STANTON AVENUE, LA HABRA, CALIFORNIA 90631
                    [Property Address]

**1.    BORROWER'S PROMISE TO PAY**
    In return for a loan that I have received, I promise to pay U.S. $  385,000.00 (this amount is
called "Principal"), plus interest, to the order of Lender. Lender is   AMERICAN MORTGAGE NETWORK,
INC., A DELAWARE CORPORATION

I will make all payments under this Note in the form of cash, check or money order.
    I understand that Lender may transfer this Note. Lender or anyone who takes this Note by transfer
and who is entitled to receive payments under this Note is called the "Note Holder."

**2.    INTEREST**
    Interest will be charged on unpaid principal until the full amount of Principal has been paid. I will
pay interest at a yearly rate of    6.375    %. The interest rate I will pay may change in accordance
with Section 4 of this Note.
    The interest rate required by this Section 2 and Section 4 of this Note is the rate I will pay both
before and after any default described in Section 7(B) of this Note.

**3.    PAYMENTS**
    **(A) Time and Place of Payments**
    I will make a payment on the    1ST   day of every month, beginning on   FEBRUARY, 2006.
Before the First Principal and Interest Payment Due Date as described in Section 4 of this Note, my
payment will consist only of the interest due on the unpaid principal balance of this Note. Thereafter, I will
pay principal and interest by making a payment every month as provided below.
    I will make my monthly payments of principal and interest beginning on the First Principal and
Interest Payment Due Date as described in Section 4 of this Note. I will make these payments every month
until I have paid all of the principal and interest and any other charges described below that I may owe
under this Note. Each monthly payment will be applied as of its scheduled due date, and if the payment
includes both principal and interest, it will be applied to interest before Principal. If, on   JANUARY 01,
2036            , I still owe amounts under this Note, I will pay those amounts in full on that date,
which is called the "Maturity Date."
    I will make monthly payments at    P. O. BOX 85302
                                        SAN DIEGO, CA, 92186
or at a different place if required by the Note Holder.
    **(B) Amount of My Monthly Payments**
    My initial monthly payments will be in the amount of U.S. $    2,045.31   . This amount
may change with the first monthly payment after the first Change Date and the first monthly payment after
every Change Date thereafter. Each of these payments will be in an amount sufficient to pay the interest
due on the unpaid principal balance at the rate determined as described in Section 4 of this Note. However,
starting with the First Principal and Interest Payment Due Date, my monthly payments will be in an amount
sufficient to repay the principal and interest at the rate determined as described in Section 4 of this Note in

LOAN NO. ◼◼◼◼4636

substantially equal installments by the Maturity Date. The Note Holder will notify me prior to the date of change in monthly payment.

**(C) Monthly Payment Changes**

Changes in my monthly payment will reflect changes in the unpaid principal of my loan and in the interest rate that I must pay. The Note Holder will determine my new interest rate and the changed amount of my monthly payment in accordance with Section 4 of this Note.

## 4. ADJUSTABLE INTEREST RATE AND MONTHLY PAYMENT CHANGES

**(A) Change Dates**

The initial fixed interest rate I will pay will change to an adjustable interest rate on the first day of JANUARY   , 2011 , and the adjustable interest rate I will pay may change on that day every   TWELFTH month thereafter. The date on which my initial fixed interest rate changes to an adjustable interest rate, and each date on which my adjustable interest rate could change, is called a "Change Date."

**(B) The Index**

Beginning with the first Change Date, my interest rate will be based on an Index. The "Index" is the average of interbank offered rates for   ONE YEAR     U.S. dollar-denominated deposits in the London market ("LIBOR"), as published in *The Wall Street Journal*. The most recent Index figure available as of   45   days before the Change Date is called the "Current Index."

If the Index is no longer available, the Note Holder will choose a new index that is based upon comparable information. The Note Holder will give me notice of this choice.

**(C) Calculation of Changes**

Before each Change Date, the Note Holder will calculate my new interest rate by adding TWO AND 250/1000   percentage points (   2.250  %) to the Current Index. The Note Holder will then round the result of this addition to the nearest one-eighth of one percentage point (0.125%). Subject to the limits stated in Section 4 (D) below, this rounded amount will be my new interest rate until the next Change Date.

For each Change Date until the Change Date immediately prior to the First Principal and Interest Payment Due Date, the Note Holder will determine the amount of the monthly payment that would be sufficient to pay only the interest on the unpaid principal that I am expected to owe at the Change Date as it accrues. The result of this calculation will be the new amount of my monthly payment. For each Change Date beginning with the Change Date immediately prior to the First Principal and Interest Payment Due Date, and for each Change Date thereafter, the Note Holder will then determine the amount of monthly payment that would be sufficient to repay the unpaid principal that I am expected to owe at the Change Date in full on the Maturity Date at my new interest rate in substantially equal payments. The result of this calculation will be the new amount of my monthly payment.

**(D) Limits on Interest Rate Changes**

The interest rate I am required to pay at the first Change Date will not be greater than 12.375 % or less than   2.250  %. Thereafter, my interest rate will never be increased or decreased on any single Change Date by more than   TWO AND 000/1000    percentage point(s) (   2.000 %) from the rate of interest I have been paying for the preceding 12     months. My interest rate will never be greater than 12.375  % or less than   2.250  %.

**(E) Effective Date of Changes**

My new interest rate will become effective on each Change Date. I will pay the amount of my new monthly payment beginning on the first monthly payment date after the Change Date until the amount of my monthly payment changes again.

**(F) Notice of Changes**

Before the effective date of any change in my interest rate and/or monthly payment, the Note Holder will deliver or mail to me a notice of such change. The notice will include information required by law to be given to me and also the title and telephone number of a person who will answer any question I may have regarding the notice.

**(G) Date of First Principal and Interest Payment**

The date of my first payment consisting of both principal and interest on this Note (the "First Principal and Interest Payment Due Date") shall be the first monthly payment date after   JANUARY 01, 2016    .

LOAN NO. ▓▓▓▓4636

**5.    BORROWER'S RIGHT TO PREPAY**

I have the right to make payments of Principal at any time before they are due. A prepayment of all the unpaid principal is known as a "Full Prepayment." A prepayment of only part of the unpaid principal is known as a "Partial Prepayment."

If I make a Partial Prepayment equal to one or more of my monthly payments, my due date may be advanced no more than one month. If I make any other Partial Prepayment, I must still make each later payment as it becomes due and in the same amount. I may make a Full or Partial Prepayment at any time.

☒ If this box is checked, no prepayment penalty will be charged on the loan.

☐ If this box is checked, I have selected a loan which has a prepayment penalty. The Prepayment Penalty Addendum attached hereto and made a part hereof defines the terms of the prepayment penalty. I understand that by agreeing to pay a prepayment penalty I acknowledge that my interest rate and/or fees are lower than they would be without a prepayment penalty.

**6.    LOAN CHARGES**

If a law, which applies to this loan and which sets maximum loan charges, is finally interpreted so that the interest or other loan charges collected or to be collected in connection with this loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from me that exceeded permitted limits will be refunded to me. The Note Holder may choose to make this refund by reducing the Principal I owe under this Note or by making a direct payment to me. If a refund reduces Principal, the reduction will be treated as a Partial Prepayment.

**7.    BORROWER'S FAILURE TO PAY AS REQUIRED**

**(A) Late Charges for Overdue Payments**

If the Note Holder has not received the full amount of any monthly payment by the end of    15 calendar days after the date it is due, I will pay a late charge to the Note Holder. The amount of the charge will be   5.00   % of my overdue payment of interest, during the period when my payment is interest only, and of the principal and interest thereafter. I will pay this late charge promptly but only once on each late payment.

**(B) Default**

If I do not pay the full amount of each monthly payment on the date it is due, I will be in default.

**(C) Notice of Default**

If I am in default, the Note Holder may send me a written notice telling me that if I do not pay the overdue amount by a certain date, the Note Holder may require me to pay immediately the full amount of Principal that has not been paid and all the interest that I owe on that amount. That date must be at least 30 days after the date on which the notice is mailed to me or delivered by other means.

**(D) No Waiver by Note Holder**

Even if, at a time when I am in default, the Note Holder does not require me to pay immediately in full as described above, the Note Holder will still have the right to do so if I am in default at a later time.

**(E) Payment of Note Holder's Costs and Expenses**

If the Note Holder has required me to pay immediately in full as described above, the Note Holder will have the right to be paid back by me for all of its costs and expenses in enforcing this Note to the extent not prohibited by applicable law. Those expenses include, for example, reasonable attorneys' fees.

**8.    GIVING OF NOTICES**

Unless applicable law requires a different method, any notice that must be given to me under this Note will be given by delivering it or by mailing it by first class mail to me at the Property Address above or a different address if I give the Note Holder a notice of that different address.

Unless the Note Holder requires a different method, any notice that must be given to the Note Holder under this Note will be given by mailing it by first class mail to the Note Holder at the address stated in Section 3(A) above or at a different address if I am given a notice of that different address.

**9.    OBLIGATIONS OF PERSONS UNDER THIS NOTE**

If more than one person signs this Note, each person is fully and personally obligated to keep all of the promises made in this Note, including the promise to pay the full amount owed. Any person who is a

LOAN NO. ████4636

guarantor, surety or endorser of this Note is also obligated to do these things. Any person who takes over these obligations, including the obligations of a guarantor, surety or endorser of this Note, is also obligated to keep all of the promises made in this Note. The Note Holder may enforce its rights under this Note against each person individually or against all of us together. This means that any one of us may be required to pay all of the amounts owed under this Note.

10.    **WAIVERS**
I and any other person who has obligations under this Note waive the rights of Presentment and Notice of Dishonor. "Presentment" means the right to require the Note Holder to demand payment of amounts due. "Notice of Dishonor" means the right to require the Note Holder to give notice to other persons that amounts due have not been paid.

11.    **SECURED NOTE**
In addition to the protections given to the Note Holder under this Note, a Mortgage, Deed of Trust, or Security Deed (the "Security Instrument"), dated the same day as this Note, protects the Note Holder from possible losses that might result if I do not keep the promises that I make in this Note. That Security Instrument describes how and under what conditions I may be required to make immediate payment in full of all amounts I owe under this Note. Some of those conditions read as follows:

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

12.    **GOVERNING LAW**
This note will be governed by federal law and, to the extent not preempted by federal law, the law of the state where the Property described in the Security Instrument is located.

WITNESS THE HAND(S) AND SEAL(S) OF THE UNDERSIGNED.

_____ (Seal)
MARTHA E. CHAMBERLIN-LOMBARD -Borrower

_____ (Seal)
-Borrower

_____ (Seal)
-Borrower

_____ (Seal)
-Borrower

*(Sign Original Only)*

# EXHIBIT "E"

 **BANCO POPULAR**

Legal Division
120 Broadway, 16th Floor
New York, New York 10271
Tel.: (212) 417-6687
Fax: (212) 417-6602

September 15, 2009

**PERSONAL AND CONFIDENTIAL**
**REGISTERED MAIL RETURN RECEIPT**

Martha E. Chamberlin-Lombardo
2541 Stanton Ave.
La Habra, CA 90631

RE: **$110,000.00 Home Equity Line of Credit Loan (the "Home Equity Loan") from**
**Banco Popular North America encumbering property located 2541 Stanton Ave.,**
**La Habra, CA 90631**

Dear Ms. Chamberlin-Lombardo:

Banco Popular North America (the "Bank") hereby advises that you are in default under the terms of the referenced loan. Such loan is presently past due in the amount of $1,934.17. Due to the current past due balance, along with your failure to make the required payments of principal and interest under your mortgage which secures the referenced real estate, demand is hereby made for the immediate payment of the principal amount of the Home Equity Loan in the amount of $109,863.36.

Such payment must be made, in certified funds, within ten (10) days after the date of this letter. If we do not receive the total due by such date, we will begin a foreclosure action without further notice to you. You will be required to pay all reasonable costs incurred by us in pursuing our rights, including title expenses, attorney's fees and other applicable costs. You have the right to reinstate your Home Equity Loan as set forth in your mortgage.

You may wish to consult a credit counseling agency to assist you. The Department of Housing and Urban Development ("HUD") can provide you with the name and address of a local HUD-approved counseling agency by calling their toll-free number at (800) 569-4287.

You have the right to bring a court action to assert the non-existence of a default or any other defense you may have to acceleration and foreclosure sale.

Martha E. Chamberlin-Lombardo
September 15, 2009
Page 2

Payment must be made at the offices of the Bank located at:

**Banco Popular North America**
**Consumer Collections Dept.**
**8523 Commodity Circle Suite 100**
**Orlando, FL  32819**
**Tel: 800-597-3289**

This letter is without prejudice to and shall not constitute a waiver or modification of the Bank's rights and remedies under the Home Equity Loan Documents, all of which are expressly reserved. Should you have any questions or concerns please contact the collections supervisor Thomas Hankard by phone at (407) 370-7543 or (800) 597-3289 ext. 7543.  He can also be reached by email at thankard@bpop.com. Thank you.

**Banco Popular North America**

By: _____
     Matthew S. Ford, Esq.
     Vice President,
     Senior Legal Counsel
     Legal Division

cc:  Marisol Reyes

# EXHIBIT "F"

# SUMMARY RESIDENTIAL APPRAISAL REPORT

### Date of Valuation

09/08/2009

### Subject Property

2541 STANTON AVE.
LA HABRA, CA 90631-5040
LOT 134, IN TRACT 2745, BOOK 80, PAGES 42-46 OF MISC. MAPS.

### For

ANDREW LOMBARDO
2541 STANTON AVE.
LA HABRA, CA 90631-5040

## TABLE OF CONTENTS

Appraiser Disclosure Statement .......................................................................................................................... 1
USPAP Identification ........................................................................................................................................... 2
GP Residential ..................................................................................................................................................... 3
Additional Comparables 4-6 ............................................................................................................................... 7
Supplemental Addendum .................................................................................................................................... 8
Public Records / Subject ..................................................................................................................................... 10
Location Map ....................................................................................................................................................... 11
Plat Map ............................................................................................................................................................... 12
Building Sketch (Page - 1) .................................................................................................................................. 13
Flood Map ............................................................................................................................................................ 14
Subject Photo's Pg. 1 .......................................................................................................................................... 15
Subject Photo's Pg. 2 .......................................................................................................................................... 16
Subject Photo's Pg. 3 .......................................................................................................................................... 17
Comparable Photos 1-3 ....................................................................................................................................... 18
Comparable Photos 4-6 ....................................................................................................................................... 19

## APPRAISER DISCLOSURE STATEMENT

File No. _____

**Name of Appraiser:**    GREGG WYNN

**Class of Certification/Licensure:**
- ☐ Certified General
- ☒ Certified Residential
- ☐ Licensed Residential
- ☐ Temporary    ☐ General    ☐ Licensed

**Certification/Licensure Number:**    AR011084
**Certification/Licensure State:**    CA    **Expires:**    06/22/2011

**Scope:**    This Report    ☒ Is within the scope of my Certification or License
☐ Is not within the scope of my Certification or License

**Service Provided By:**    ☒ Disinterested & Unbiased Third Party
☐ Interested & Biased Third Party
☐ Interested Third Party on Contingent Fee Basis

**Signature of person preparing and reporting the Appraisal:**

GREGG WYNN

This form must be included in conjunction with all appraisal assignments or specialized services
performed by a state-certified or state-licensed real estate appraiser.

ABSOLUTE APPRAISALS (714) 441-1987

| Owner | LOMBARDO | | | File No. | |
|---|---|---|---|---|---|
| Property Address | 2541 STANTON AVE. | | | | |
| City | LA HABRA | County ORANGE | | State CA | Zip Code 90631-5040 |
| Appraiser | GREGG WYNN | | | | |

# APPRAISAL AND REPORT IDENTIFICATION

This Appraisal Report is one of the following types:

☐ **Self Contained**   (A written report prepared under Standards Rule  2-2(a) , pursuant to the Scope of Work, as disclosed elsewhere in this report.)

☒ **Summary**   (A written report prepared under Standards Rule  2-2(b) , pursuant to the Scope of Work, as disclosed elsewhere in this report.)

☐ **Restricted Use**   (A written report prepared under Standards Rule  2-2(c) , pursuant to the Scope of Work, as disclosed elsewhere in this report, restricted to the stated intended use by the specified client or intended user.)

## Comments on Standards Rule 2-3

I certify that, to the best of my knowledge and belief:

* The statements of fact contained in this report are true and correct.

* The reported analyses, opinions, and conclusions are limited only by the reported assumptions and limiting conditions and are my personal, impartial, and unbiased professional analyses, opinions, and conclusions.

* I have no (or the specified) present or prospective interest in the property that is the subject of this report and no (or the specified) personal interest with respect to the parties involved.

* I have no bias with respect to the property that is the subject of this report or the parties involved with this assignment.

* My engagement in this assignment was not contingent upon developing or reporting predetermined results.

* My compensation for completing this assignment is not contingent upon the development or reporting of a predetermined value or direction in value that favors the cause of the client, the amount of the value opinion, the attainment of a stipulated result, or the occurrence of a subsequent event directly related to the intended use of this appraisal.

* My analyses, opinions and conclusions were developed and this report was prepared, in conformity w/ the Uniform Standards of Professional Appraisal Practice.

* I have (or have not) made a personal inspection of the property that is the subject of this report.

* No one provided significant real property appraisal assistance to the person signing this certification. (If there are exceptions, the name of each individual providing significant real property appraisal assistance is stated elsewhere in this report.)

## Comments on Appraisal and Report Identification
Note any USPAP related issues requiring disclosure and any State mandated requirements:

NONE.

| APPRAISER: | Co-Appraiser: |
|---|---|
| Signature: *Gregg Wynn* | Signature: |
| Name: GREGG WYNN | Name: |
| Date Signed: 09/10/2009 | Date Signed: |
| State Certification #: AR011084 | State Certification #: |
| or State License #: | or State License #: |
| State: CA | State: |
| Expiration Date of Certification or License: 06/22/2011 | Expiration Date of Certification or License: |
| Inspection of Subject: | Inspection of Subject: |
| ☐ None  ☒ Interior  ☒ Exterior | ☐ None  ☐ Interior  ☐ Exterior |
| Date of Inspection 09/08/2009 | Date of Inspection |

# RESIDENTIAL APPRAISAL SUMMARY REPORT

File No.:

## SUBJECT

| | | | |
|---|---|---|---|
| Property Address: 2541 STANTON AVE. | City: LA HABRA | State: CA | Zip Code: 90631-5040 |

County: ORANGE  Legal Description: LOT 134, IN TRACT 2745, BOOK 80, PAGES 42-45 OF MISC. MAPS.

Assessor's Parcel #: 018-221-06

Tax Year: 2008  R.E. Taxes: $ 2,070.12  Special Assessments: $ NONE  Borrower (if applicable): N/A

Current Owner of Record: LOMBARDO  Occupant: ☒ Owner ☐ Tenant ☐ Vacant  ☐ Manufactured Housing

Project Type: ☐ PUD ☐ Condominium ☐ Cooperative ☐ Other (describe)  HOA: $ N/A ☐ per year ☐ per month

Market Area Name: NONE  Map Reference: TG: 708-B6  Census Tract: 0011.02

## ASSIGNMENT

The purpose of this appraisal is to develop an opinion of:  ☒ Market Value (as defined), or ☐ other type of value (describe)

This report reflects the following value (if not Current, see comments):  ☒ Current (the inspection Date is the Effective Date)  ☐ Retrospective  ☐ Prospective

Approaches developed for this appraisal:  ☒ Sales Comparison Approach  ☐ Cost Approach  ☐ Income Approach (See Reconciliation Comments and Scope of Work)

Property Rights Appraised:  ☒ Fee Simple  ☐ Leasehold  ☐ Leased Fee  ☐ Other (describe)

Intended Use: BANKRUPTCY PROCEEDINGS.

Intended User(s) (by name or type):  ANDREW LOMBARO, AND HIS ATTORNEY(S).

Client: ANDREW LOMBARDO  Address: 2541 STANTON AVE., LA HABRA, CA 90631

Appraiser: GREGG WYNN  Address: 281 E. COUNTRY HILLS DR., LA HABRA, CA 90631

## MARKET AREA DESCRIPTION

| | | | | Predominant Occupancy | One-Unit Housing PRICE $(000) / AGE (yrs) | Present Land Use | Change in Land Use |
|---|---|---|---|---|---|---|---|
| Location: | ☐ Urban | ☒ Suburban | ☐ Rural | | | One-Unit 83 % | ☒ Not Likely |
| Built up: | ☒ Over 75% | ☐ 25-75% | ☐ Under 25% | ☒ Owner | 210  Low  29 | 2-4 Unit 3 % | ☐ Likely *  ☐ In Process * |
| Growth rate: | ☐ Rapid | ☒ Stable | ☐ Slow | ☐ Tenant | 540  High  59 | Multi-Unit 5 % | * To: |
| Property values: | ☐ Increasing | ☒ Stable | ☐ Declining | ☐ Vacant (0-5%) | 285  Pred  54 | Comm'l 7 % | |
| Demand/supply: | ☐ Shortage | ☒ In Balance | ☐ Over Supply | ☐ Vacant (>5%) | | Other 2 % | |
| Marketing time: | ☐ Under 3 Mos. | ☒ 3-6 Mos. | ☐ Over 6 Mos. | | | | |

Market Area Boundaries, Description, and Market Conditions (including support for the above characteristics and trends):

NEIGHBORHOOD BOUNDARIES: (N) WHITTIER BLVD., (E) S. IDAHO ST., (S) W. IMPERIAL HWY., (W) THE WHITTIER/LOS ANGELES COUNTY BORDER. NEIGHBORHOOD DESCRIPTION: THIS IS A WELL ESTABLISHED NEIGHBORHOOD, MOSTLY COMPRISED OF OLDER CONFORMING WOOD-FRAMED AND STUCCOED SINGLE FAMILY RESIDENTIAL HOMES. MARKET APPEAL OF THIS AREA IS ABOVE AVERAGE. ALL NECESSARY SUPPORT SERVICES ARE READILY ACCESSIBLE. EMPLOYMENT FOR THE REGION DOES APPEAR TO BE STABLE. NO APPARENT EXTERNAL INADEQUACIES NOTED. FREEWAY ACCESS TO THE AREA IS AVG. MARKET CONDITIONS: THIS SINGLE FAMILY MARKET IS ACTIVE. LOCAL SINGLE FAMILY HOME VALUES HAVE DECLINED 26.9% OVER THE PAST 12 MONTHS. ESTIMATED MARKETING TIME REQUIRED IS WITHIN 6 MONTHS. SELLER PAID CONCESSIONS ARE COMMON IN THIS MARKETPLACE. INTEREST RATES ARE LOW & ATTRACTIVE. LENDING TERMS HAVE TIGHTENED NOTABLY, DUE TO THE SUB-PRIME MARKET FALLOUT.

## SITE DESCRIPTION

Dimensions: 60 FT. X 100 FT.  Site Area: 6,000 SQ. FT.

Zoning Classification: R1  Description: SINGLE FAMILY RESIDENTIAL

Zoning Compliance: ☒ Legal ☐ Legal nonconforming (grandfathered) ☐ Illegal ☐ No zoning

Are CC&Rs applicable? ☐ Yes ☒ No ☐ Unknown  Have the documents been reviewed? ☐ Yes ☐ No  Ground Rent (if applicable) $ /

Highest & Best Use as improved: ☒ Present use, or ☐ Other use (explain)

Actual Use as of Effective Date: SINGLE FAMILY RESIDENTIAL  Use as appraised in this report: SINGLE FAMILY RESIDENTIAL

Summary of Highest & Best Use: CURRENT USE IS THE HIGHEST AND BEST USE; NO KNOWN CONDITIONS WHICH WILL CHANGE PROPERTY USE.

| Utilities | Public | Other | Provider/Description | Off-site Improvements | Type | Public | Private | Topography | STREET LEVEL |
|---|---|---|---|---|---|---|---|---|---|
| Electricity | ☒ | ☐ | | Street | ASPHALT | ☒ | ☐ | Size | TYPICAL OF THE AREA. |
| Gas | ☒ | ☐ | | Curb/Gutter | CONCRETE | ☒ | ☐ | Shape | RECTANGULAR |
| Water | ☒ | ☐ | | Sidewalk | CONCRETE | ☒ | ☐ | Drainage | APPEARS ADEQUATE |
| Sanitary Sewer | ☒ | ☐ | | Street Lights | STANDARD | ☒ | ☐ | View | NONE |
| Storm Sewer | ☒ | ☐ | | Alley | NONE | ☐ | ☐ | | |

Other site elements: ☒ Inside Lot ☐ Corner Lot ☐ Cul de Sac ☐ Underground Utilities ☐ Other (describe)

FEMA Spec'l Flood Hazard Area ☒ Yes ☐ No  FEMA Flood Zone AO  FEMA Map # 06059C0036H  FEMA Map Date 02/18/2004

Site Comments: THIS IS AN AVERAGE SIZED INTERIOR LOT, GRADED AT OR NEAR STREET LEVEL. SETBACKS ARE COMMON FOR THE AREA, WITH NO APPARENT EASEMENTS OR ENCROACHMENTS NOTED, ASIDE FROM CUSTOMARY UTILITY EASEMENTS. LANDSCAPING IS IN FAIR-AVERAGE CONDITION, AND THERE'S COVERED PATIO. THE ASPHALT DRIVEWAY IS WELL MAINTAINED, BUT MOST DRIVEWAYS IN THIS AREA HAVE BEEN UPGRADED TO CONCRETE. NO APPARENT SITE INADEQUACIES WERE OBSERVED, AND THE SUBJECT SITE DOES APPEAR TO BE READILY MARKETABLE.

## IMPROVEMENTS

| General Description | | Exterior Description | | Foundation | | Basement | ☒ None | Heating | |
|---|---|---|---|---|---|---|---|---|---|
| # of Units | 1 ☐ Acc.Unit | Foundation | CONCRETE | Slab | 0 | Area Sq. Ft. | N/A | Type | FAU |
| # of Stories | 1 | Exterior Walls | STUCCO/GOOD | Crawl Space | 100% | % Finished | N/A | Fuel | GAS |
| Type ☒ Det. ☐ Att. | | Roof Surface | COMP SHG/GD. | Basement | N/A | Ceiling | N/A | | |
| Design (Style) | CONVENTIONAL | Gutters & Dwnspts. | EAVES/AVERAGE | Sump Pump ☐ N/A | | Walls | N/A | Cooling | |
| ☒ Existing ☐ Proposed ☐ Und.Cons. | | Window Type | VINYL SLID/GD. | Dampness | ☐ NONE | Floor | N/A | Central | NONE |
| Actual Age (Yrs.) | 54 YRS. | Storm/Screens | NONE/YES | Settlement | NONE NOTED. | Outside Entry | N/A | Other | WALL/GD. |
| Effective Age (Yrs.) | 25 | | | Infestation | NONE NOTED. | | | | |

Copyright© 2007 by a la mode, inc. This form may be reproduced unmodified without written permission, however, a la mode, inc. must be acknowledged and credited.

**GP RESIDENTIAL**  Form GPRES2 LT — "WinTOTAL" appraisal software by a la mode, inc. — 1-800-ALAMODE  3/2007

64

# RESIDENTIAL APPRAISAL SUMMARY REPORT

File No.:

## DESCRIPTION OF IMPROVEMENTS (continued)

| Interior Description | | Appliances | | Attic | None | Amenities | | | |
|---|---|---|---|---|---|---|---|---|---|
| Floors | CARPET-TILE/FAIR-GD | Refrigerator | ☐ | Stairs | ☐ | Fireplace(s) # | 1 | Woodstove(s) # | |
| Walls | DRYWALL/AVERAGE | Range/Oven | P | Drop Stair | ☐ | Patio | CVRD. | | |
| Trim/Finish | WOOD/AVERAGE + | Disposal | ☒ | Scuttle | ☒ | Deck | | | |
| Bath Floor | CERAMIC/AVERAGE | Dishwasher | ☐ | Doorway | ☐ | Porch | YES | | |
| Bath Wainscot | CERAMIC/AVERAGE | Fan/Hood | ☒ | Floor | ☐ | Fence | BLOCK | | |
| Doors | HOL-CORE/AVERAGE | Microwave | ☒ | Heated | ☐ | Pool | | | |
| | | Washer/Dryer | ☐ | Finished | ☐ | | | | |

| Car Storage | ☐ None |
|---|---|
| Garage  # of cars ( 4  Tot.) | |
| Attach. | 2 |
| Detach. | |
| Blt.-in | |
| Carport | |
| Driveway | 2 |
| Surface | ASPHALT |

Finished area above grade contains: 5 Rooms  3 Bedrooms  1.75 Bath(s)  1,202 Square Feet of Gross Living Area Above Grade

Additional features: UPGRADED KITCHEN, UPGRADED MASTER BATHROOM w/CUSTOM CAVE-LIKE DESIGN, NEWER STUCCO, NEWER ROOF COVERING, NEWER VINYL SLIDING WINDOWS, AND NEWER WALL A/C UNIT.

Describe the condition of the property (including physical, functional and external obsolescence): THE SUBJECT IS IN ABOVE AVERAGE OVERALL CONDITION FOR THIS AREA. NO FORMAL INSPECTION REPORTS HAVE BEEN PROVIDED FOR REVIEW. THERE'S A CRACK IN THE LIVING ROOM CEILING, LIKELY DUE TO PAST SEISMIC ACTIVITY. THE LIVING ROOM CARPETING IS OLDER AND NEEDS TO BE REPLACED. THE SUBJECTS AMENITIES APPEAR TO BE ADEQUATE FOR THIS AREA. THE PATIO SLAB IS ALSO CRACKED. NO APPARENT FUNCTIONAL, OR EXTERNAL INADEQUACIES WERE OBSERVED.

## SALES COMPARISON APPROACH

**SALES COMPARISON APPROACH TO VALUE (If developed)**  ☐ The Sales Comparison Approach was not developed for this appraisal.

| FEATURE | SUBJECT | COMPARABLE SALE # 1 | +(-) $ Adjust. | COMPARABLE SALE # 2 | +(-) $ Adjust. | COMPARABLE SALE # 3 | +(-) $ Adjust. |
|---|---|---|---|---|---|---|---|
| Address | 2541 STANTON AVE. LA HABRA, CA 90631-5040 | 720 RIGSBY ST. LA HABRA | | 2421 SIDON AVE. LA HABRA | | 2601 UNION AVE. LA HABRA | |
| Proximity to Subject | | 0.60 miles N | | 0.32 miles SE | | 0.20 miles S | |
| Sale Price | $N/A | $ 320,000 | | $ 305,000 | | $ 310,000 | |
| Sale Price/GLA | $ /sq.ft. | $ 229.39 /sq.ft. | | $ 268.25 /sq.ft. | | $ 268.17 /sq.ft. | |
| Data Source(s) | NDC/REALIST | NDC/REALIST/MLS (6 DOM) | | NDC/REALIST/MLS (194 DOM) | | NDC/REALIST/MLS (56 DOM) | |
| Verification Source(s) | & INSPECTION. | DOC# 277226 | | DOC# 384568 | | DOC# 299804 | |
| VALUE ADJUSTMENTS | DESCRIPTION | DESCRIPTION | +(-) $ Adjust. | DESCRIPTION | +(-) $ Adjust. | DESCRIPTION | +(-) $ Adjust. |
| Sales or Financing Concessions | | 97% FHA FINANCED. | | 101% CONV. FINANCED. | | 80% CONV. FINANCED. | |
| Date of Sale/Time | 09/08/2009 DOI | 06/01/2009 | -22,000 | 07/17/2009 | -11,700 | 06/10/2009 | -13,300 |
| Rights Appraised | FEE SIMPLE | FEE SIMPLE | | FEE SIMPLE | | FEE SIMPLE | |
| Location | AVERAGE | AVERAGE | | AVERAGE | | AVERAGE | |
| Site | 6,000 SQ. FT. | 10,005 SQ. FT. | -6,000 | 5,605 SQ. FT. | +800 | 7,800 SQ. FT. | -3,600 |
| View | NONE | NONE | | NONE | | NONE | |
| Design (Style) | CONVENTIONAL | CONVENTIONAL | | CONVENTIONAL | | CONVENTIONAL | |
| Quality of Construction | AVERAGE | AVERAGE | | AVERAGE | | AVERAGE | |
| Age | 54 YRS. | 53 YRS. | | 52 YRS. | | 52 YRS. | |
| Condition | ABOVE AVG. | ABOVE AVG. | | GOOD | -15,000 | GOOD | -15,000 |

| Above Grade Room Count | Total | Bdrms | Baths | Total | Bdrms | Baths | +(-) | Total | Bdrms | Baths | +(-) | Total | Bdrms | Baths | +(-) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 5 | 3 | 1.75 | 6 | 3 | 2.00 | | 5 | 3 | 2.00 | | 5 | 3 | 2.00 | |

| VALUE ADJUSTMENTS | DESCRIPTION | DESCRIPTION | +(-) $ Adjust. | DESCRIPTION | +(-) $ Adjust. | DESCRIPTION | +(-) $ Adjust. |
|---|---|---|---|---|---|---|---|
| Gross Living Area | 1,202 sq.ft. | 1,395 sq.ft. | -5,800 | 1,137 sq.ft. | +2,300 | 1,156 sq.ft. | +1,600 |
| Basement & Finished | N/A | N/A | | N/A | | N/A | |
| Rooms Below Grade | N/A | N/A | | N/A | | N/A | |
| Functional Utility | AVERAGE | AVERAGE | | AVERAGE | | AVERAGE | |
| Heating/Cooling | FAU/NONE | WALL/NONE | +2,000 | FAU/CAC | -2,000 | WALL/NONE | +2,000 |
| Energy Efficient Items | NONE | NONE | | NONE | | NONE | |
| Garage/Carport | 2 CAR GARAGE | 2 CAR GARAGE | | 2 CAR GARAGE | | 2 CAR GARAGE | |
| Porch/Patio/Deck | CVRD. PATIO | CVRD. PATIO | | NO PATIO | +4,000 | CVRD. PATIO | |
| Exterior Improvements | AVERAGE | AVERAGE | | AVERAGE | | NEEDS LANDSCP. | +2,000 |
| Swimming Pool Amenity | NO POOL | NO POOL | | NO POOL | | NO POOL | |
| Fireplace Amenity | FIREPLACE | FIREPLACE | | NO FIREPLACE | +2,500 | NO FIREPLACE | +2,500 |

| Net Adjustment (Total) | | ☐ +  ☒ -  $ -32,800 | ☐ +  ☒ -  $ -19,100 | ☐ +  ☒ -  $ -23,800 |
|---|---|---|---|---|
| Adjusted Sale Price of Comparables | | Net 10.3 %  Gross 11.5 % $ 287,200 | Net 6.3 %  Gross 12.6 % $ 285,900 | Net 7.7 %  Gross 12.9 % $ 286,200 |

Copyright© 2007 by a la mode, inc. This form may be reproduced unmodified without written permission, however, a la mode, inc. must be acknowledged and credited.

**GP RESIDENTIAL**  Form GPRES2 LT — "WinTOTAL" appraisal software by a la mode, inc. — 1-800-ALAMODE  3/2007

# RESIDENTIAL APPRAISAL SUMMARY REPORT

File No.:

**SALES COMPARISON APPROACH (continued)**

Summary of Sales Comparison Approach   ALL SALES COMPARABLES ARE VERIFIED CLOSED SALES (VIA 2 SECONDARY SOURCE DATABASES) FROM WITHIN THE SUBJECTS IMMEDIATE MARKETING AREA. ALL COMPARABLES ARE SIMILAR TO THE SUBJECT IN TERMS OF AGE, DESIGN, GLA, BATH TOTAL, AND OVERALL APPEAL. DUE TO THE LACK OF RECENT SALES OF COMPARABLE 3 BEDROOM HOMES IN THE AREA, SALES COMP 5 IS A 4 BEDROOM HOME. MOST WEIGHT HAS BEEN PLACED ON SALES COMPARABLE #1, DUE TO ITS SIMILAR OVERALL CONDITION, AND ITS MOST SIMILAR OVERALL APPEAL. ADJUSTMENTS WERE MADE AS FOLLOWS: $2 PER SQ. FT. FOR LOT SIZE DIFFERENCES, $35 PER SQ. FT. FOR GLA ADJ., $20,000 PER ADD. BEDROOM. ALL ADJUSTMENTS WERE ROUNDED TO THE NEAREST $100 INCREMENT, AND THE BRACKETING METHOD HAS BEEN APPLIED.

Indicated Value by Sales Comparison Approach $   285,000

**TRANSFER HISTORY**

My research ☐ did ☒ did not reveal any prior sales or transfers of the subject property for the three years prior to the effective date of this appraisal.
Data Source(s): NDC DATA.

| 1st Prior Subject Sale/Transfer | Analysis of sale/transfer history and/or any current agreement of sale/listing:   PER NDC RECORDS, THE SUBJECT HAS NOT |
| Date:   NONE WITHIN THE | TRANSFERRED OWNERSHIP WITHIN THE PAST 36 MONTHS. PER NDC RECORDS, SALES COMPS 1 AND 3 HAVE |
| Price:   PAST 36 MONTHS. | HAD A PRIOR TRANSFER OF OWNERSHIP WITHIN THE PAST 12 MONTHS. |
| Source(s): NDC | |
| 2nd Prior Subject Sale/Transfer | |
| Date:   NONE WITHIN THE | |
| Price:   PAST 36 MONTHS. | |
| Source(s): NDC | |

**COST APPROACH**

COST APPROACH TO VALUE (if developed)   ☒ The Cost Approach was not developed for this appraisal.
Provide adequate information for replication of the following cost figures and calculations.
Support for the opinion of site value (summary of comparable land sales or other methods for estimating site value):

| ESTIMATED ☐ REPRODUCTION OR ☐ REPLACEMENT COST NEW | OPINION OF SITE VALUE ..................................... | =$ |
| Source of cost data: | DWELLING | Sq.Ft. @ $ | =$ |
| Quality rating from cost service:   Effective date of cost data: | N/A | Sq.Ft. @ $ | =$ |
| Comments on Cost Approach (gross living area calculations, depreciation, etc.): | | Sq.Ft. @ $ | =$ |
| | | Sq.Ft. @ $ | =$ |
| | | | =$ |
| | Garage/Carport | Sq.Ft. @ $ | =$ |
| | Total Estimate of Cost-New | | =$ |
| | Less      Physical | Functional | External | |
| | Depreciation | | | =$( ) |
| | Depreciated Cost of Improvements ......................... | =$ |
| | "As-Is" Value of Site Improvements ....................... | =$ |
| | | =$ |
| | | =$ |
| Estimated Remaining Economic Life (if required):          Years | INDICATED VALUE BY COST APPROACH | =$ |

GP RESIDENTIAL
Copyright© 2007 by a la mode, inc. This form may be reproduced unmodified without written permission, however, a la mode, inc. must be acknowledged and credited.
Form GPRES2 LT — "WinTOTAL" appraisal software by a la mode, inc. — 1-800-ALAMODE          3/2007

# RESIDENTIAL APPRAISAL SUMMARY REPORT

File No.:

## INCOME APPROACH TO VALUE (If developed)    ☒ The Income Approach was not developed for this appraisal.

Estimated Monthly Market Rent $  N/A    X Gross Rent Multiplier    N/A    = $    Indicated Value by Income Approach

Summary of Income Approach (including support for market rent and GRM): N/A

## PROJECT INFORMATION FOR PUDs (If applicable)    ☐ The Subject is part of a Planned Unit Development.

Legal Name of Project   N/A

Describe common elements and recreational facilities:   N/A

Indicated Value by: Sales Comparison Approach $ 286,000    Cost Approach (If developed) $ N/A    Income Approach (If developed) $ N/A

Final Reconciliation   SEE ATTACHED ADDENDA

This appraisal is made ☒ "as is", ☐ subject to completion per plans and specifications on the basis of a Hypothetical Condition that the improvements have been completed, ☐ subject to the following repairs or alterations on the basis of a Hypothetical Condition that the repairs or alterations have been completed, ☐ subject to the following required inspection based on the Extraordinary Assumption that the condition or deficiency does not require alteration or repair:

☐ This report is also subject to other Hypothetical Conditions and/or Extraordinary Assumptions as specified in the attached addenda.

Based on the degree of inspection of the subject property, as indicated below, defined Scope of Work, Statement of Assumptions and Limiting Conditions, and Appraiser's Certifications, my (our) Opinion of the Market Value (or other specified value type), as defined herein, of the real property that is the subject of this report is: $    286,000    , as of:    09/08/2009    , which is the effective date of this appraisal. If indicated above, this Opinion of Value is subject to Hypothetical Conditions and/or Extraordinary Assumptions included in this report. See attached addenda.

A true and complete copy of this report contains   19   pages, including exhibits which are considered an integral part of the report. This appraisal report may not be properly understood without reference to the information contained in the complete report.

Attached Exhibits:

☒ Scope of Work    ☒ Limiting Cond./Certifications    ☐ Narrative Addendum    ☒ Photograph Addenda    ☒ Sketch Addendum
☒ Map Addenda    ☒ Additional Sales    ☐ Cost Addendum    ☒ Flood Addendum    ☐ Manuf. House Addendum
☐ Hypothetical Conditions    ☐ Extraordinary Assumptions    ☐    ☐    ☐

Client Contact:   ANDREW LOMBARDO    Client Name:   ANDREW LOMBARDO

E-Mail:    Address:   2541 STANTON AVE., LA HABRA, CA  90631

## APPRAISER

## SUPERVISORY APPRAISER (if required) or CO-APPRAISER (if applicable)

Appraiser Name:   GREGG WYNN    Supervisory or Co-Appraiser Name:

Company:   ABSOLUTE APPRAISALS    Company:

Phone: 714-441-1987    Fax 714-441-1953    Phone:    Fax

E-Mail: wynng@roadrunner.com    E-Mail:

Date of Report (Signature):   09/10/2009    Date of Report (Signature):

License or Certification #:   AR011084    State:  CA    License or Certification #:    State:

Designation:    Designation:

Expiration Date of License or Certification:    06/22/2011    Expiration Date of License or Certification:

Inspection of Subject:  ☒ Interior & Exterior    Exterior Only ☐    None ☐    Inspection of Subject:  ☐ Interior & Exterior    Exterior Only ☐    None ☐

Date of Inspection:    09/08/2009    Date of Inspection:

**GP RESIDENTIAL**

Copyright© 2007 by a la mode, inc. This form may be reproduced unmodified without written permission, however, a la mode, inc. must be acknowledged and credited.

Form GPRES2 LT — "WinTOTAL" appraisal software by a la mode, inc. — 1-800-ALAMODE    3/2007

# ADDITIONAL COMPARABLE SALES

File No.:

| FEATURE | SUBJECT | COMPARABLE SALE # 4 | | COMPARABLE SALE # 5 | | COMPARABLE SALE # 6 | |
|---|---|---|---|---|---|---|---|
| Address 2541 STANTON AVE. | | 351 N. DEXFORD DR. | | 541 MARIPOSA AVE. | | | |
| LA HABRA, CA 90631-5040 | | LA HABRA | | LA HABRA | | | |
| Proximity to Subject | | 0.38 miles NE | | 0.37 miles SE | | | |
| Sale Price | $N/A | | $ 310,000 | | $ 330,000 | | $ |
| Sale Price/GLA | $ /sq.ft. | $ 259.85 /sq.ft. | | $ 273.86 /sq.ft. | | $ /sq.ft. | |
| Data Source(s) | NDC/REALIST | NDC/REALIST/MLS (31 DOM) | | NDC/REALIST/MLS (131 DOM) | | | |
| Verification Source(s) | & INSPECTION. | DOC# 227290 | | DOC# 430251 | | | |
| VALUE ADJUSTMENTS | DESCRIPTION | DESCRIPTION | +(-) $ Adjust. | DESCRIPTION | +(-) $ Adjust. | DESCRIPTION | +(-) $ Adjust. |
| Sales or Financing | | 98% FHA | | 97% FHA | | | |
| Concessions | | FINANCED. | | FINANCED. | | | |
| Date of Sale/Time | 09/08/2009 DOI | 05/07/2009 | -27,700 | 08/10/2009 | -6,400 | | |
| Rights Appraised | FEE SIMPLE | FEE SIMPLE | | FEE SIMPLE | | | |
| Location | AVERAGE | BACKS WASH | +5,000 | AVERAGE | | | |
| Site | 6,000 SQ. FT. | 7,800 SQ. FT. | -3,600 | 6,200 SQ. FT. | -400 | | |
| View | NONE | NONE | | NONE | | | |
| Design (Style) | CONVENTIONAL | CONVENTIONAL | | CONVENTIONAL | | | |
| Quality of Construction | AVERAGE | AVERAGE | | AVERAGE | | | |
| Age | 54 YRS. | 54 YRS. | | 53 YRS. | | | |
| Condition | ABOVE AVG. | ABOVE AVG. | | GOOD | -15,000 | | |
| Above Grade | Total / Bdrms / Baths | Total / Bdrms / Baths | | Total / Bdrms / Baths | -20,000 | Total / Bdrms / Baths | |
| Room Count | 5 / 3 / 1.75 | 5 / 3 / 2.00 | | 6 / 4 / 2.00 | | | |
| Gross Living Area | 1,202 sq.ft. | 1,193 sq.ft. | +300 | 1,205 sq.ft. | -100 | sq.ft. | |
| Basement & Finished | N/A | | | | | | |
| Rooms Below Grade | N/A | N/A | | N/A | | | |
| Functional Utility | AVERAGE | AVERAGE | | AVERAGE | | | |
| Heating/Cooling | FAU/NONE | FAU/CAC | -2,000 | FAU/NONE | | | |
| Energy Efficient Items | NONE | NONE | | NONE | | | |
| Garage/Carport | 2 CAR GARAGE | 2 CAR GARAGE | | 2 CAR GARAGE | | | |
| Porch/Patio/Deck | CVRD. PATIO | NO PATIO | +4,000 | ENC. PATIO | -4,000 | | |
| Exterior Improvements | AVERAGE | AVERAGE | | AVERAGE | | | |
| Swimming Pool Amenity | NO POOL | NO POOL | | NO POOL | | | |
| Fireplace Amenity | FIREPLACE | FIREPLACE | | NO FIREPLACE | +2,500 | | |
| | | | | | | | |
| Net Adjustment (Total) | | ☐ + ☒ - $ | -24,000 | ☐ + ☒ - $ | -43,400 | ☐ + ☐ - $ | |
| Adjusted Sale Price | | Net 7.7 % | | Net 13.2 % | | Net % | |
| of Comparables | | Gross 13.7 % $ | 286,000 | Gross 14.7 % $ | 286,600 | Gross % $ | |
| Summary of Sales Comparison Approach | SEE TOP OF PAGE 3. | | | | | | |

*(Left margin, vertical text: SALES COMPARISON APPROACH)*

Copyright© 2007 by a la mode, inc. This form may be reproduced unmodified without written permission, however, a la mode, inc. must be acknowledged and credited.

GP RESIDENTIAL     Form GPRES2 LT.(AC) — "WinTOTAL" appraisal software by a la mode, inc. — 1-800-ALAMODE     3/2007

68

### Supplemental Addendum

File No.

| Owner | LOMBARDO | | | | | |
|---|---|---|---|---|---|---|
| Property Address | 2541 STANTON AVE. | | | | | |
| City | LA HABRA | | County | ORANGE | State  CA | Zip Code  90631-5040 |
| Appraiser | GREGG WYNN | | | | | |

**• Scope of the Appraisal:**

The scope of the appraisal refers to the extent of the process of collecting, analyzing and reporting data. Data pertaining to the subject property is generally gathered by the appraiser, at the time of the physical inspection of the said property, along with a search of public records pertaining to the subject, and a verbal interview with the owner or agent for the subject property. The exterior of the subject is measured by the appraiser, and compared with county tax assessor's records. The search for comparable data is generally localized to the subject's neighborhood, or in the event of a lack of credible comparable sales within the subjects immediate neighborhood, a search of the closest competing neighborhoods may be considered. The appraisers primary data sources are the National Data Cooperative (NDC), Realist.com, Multiple Listing Service (MLS), and various title companies when necessary.

In areas where an on-line MLS (Multiple Listing Service) information is available to the appraiser, a search is made to obtain information as to whether the subject has or has not been recently listed for sale. Where additional comparable sales, listings, and enhancement of existing sales data may be available. Where possible, amenities, sales prices, and terms of sales were verified with someone familiar with the sale. In areas where on-line MLS is not available to the appraiser, a prudent and deliberate search for supplemental information on comparable sales data is made through local real estate offices. When necessary, incomplete or vague information supplied by the above mentioned data sources, is verified by contacting one of several local title companies, and/or immediate parties to the transaction, when available.

Consideration is given to the quality and/or reliability of the data sources used. Additional comparables are normally added in cases where a wide divergence of value indications is produced; a narrow spread normally results in fewer comparables (with a minimum of three). Generally, as a result of the above described data search, many comparable sales are reviewed. Seven to twelve are normally researched before selections are made. This appraisal report is intended to be a self contained document including all information necessary to enable the reader to understand the appraiser's opinion. Any third party studies that are referred to, such as pest control or home inspectors, have been verified by the appraiser to the extent that the assumptions and conclusions are used. Any personal property involved in the transaction has been excluded from the valuation of the real property. Should a transaction which includes personal property of sufficient value to affect the market value be evident, a separate assessment of the personal property, fixtures, or intangible items will be included with the report as a separate valuation. The INTENT of the report is to comply with the Uniform Standards of Professional Practice as adopted by the Appraisal Standards Board of the Appraisal Foundation as of August 9, 1990, as well as all California State Regulations. The appraiser possesses the appropriate knowledge, education and experience to complete this assignment.

**• Intended User and Appraisal Use Comment:**

The intended user of this appraisal report is the client. The intended use is to evaluate the property that is the subject of this appraisal report for bankruptcy proceedings, subject to the stated Scope of Work, purpose of the appraisal, reporting requirements of this appraisal report form, and the definition of market value. This appraisal is not valid for any other use.

## Supplemental Addendum

File No.

| Owner | LOMBARDO | | | | | | |
|---|---|---|---|---|---|---|---|
| Property Address | 2541 STANTON AVE. | | | | | | |
| City | LA HABRA | County | ORANGE | | State | CA | Zip Code | 90631-5040 |
| Appraiser | GREGG WYNN | | | | | | |

• <u>Purpose and Function of this report</u>:

1. The **Purpose** of this report is to estimate the "Fair Market Value" as defined in the attached "Statement of Limiting Conditions" and in accordance with the FHLBB, as of the date of valuation stated herein. This estimate is to be a "cash equivalent" market value for the subject property. 2. **Function:** This appraisal report is to be used to assist my client and his or her attorney(s) in bankruptcy proceedings, or subsequent income tax purposes.

• <u>Sales Comparison Approach Con't</u>:

The appraiser has made a diligent search to find recent comparable sales similar to the subject. The appraiser has utilized National Data Cooperative (NDC), a First American Title Co. database (Realist.Com), and the local Multiple Listing Service (MLS), and customer service centers at various title companies when needed. The information provided through these sources was considered, analyzed, and reconciled. The appraiser utilized the best sales data available at the time of inspection. Condition adjustments were made based on paired sales analysis by comparing the subject's interior and exterior condition at the time of the inspection to the comparable sales. The condition rating for the comparable is based upon a drive-by inspection of the sales and information obtained through sources such as county records, the local MLS, personal inspection, and /or conversations with listing agents (if noted), as to the amenities and condition of the interior of the sales comparable.

• <u>Reconciliation and Final Value Conclusion</u>:

The final reconciliation is the process of compiling, coordinating, and integrating related facts to form a reasonable and unified value conclusion. This final value conclusion should represent, in a logical and orderly fashion, the correlation of independent elements and is a prerequisite to procedures and techniques within the framework of the approaches used to derive the preliminary value conclusion is required.

The Market Data Approach indicated a value conclusion for the subject property predicated on a comparative analysis of recent sales of similar properties. The predicated merits of this approach are limited by the heterogeneous nature of real estate, imperfect market conditions, widely divergent financing terms and the inherent subjectivity of adjustments. In the case of the subject property, this approach was given the most weight due to the fact that there was reasonable sales data for similar types of properties with similar amenities. This approach also best reflects the attitudes of informed buyers and sellers in the marketplace.

Due to the lack of verifiable income data, the Income Approach was not utilized in this analysis. Due to the complexity of estimating site value using the abstraction method, and the lack of recent sales of similar vacant lots in the area, the Cost Approach was also not utilized in this analysis.

## Public Records / Subject

| Owner | LOMBARDO | | | | |
|---|---|---|---|---|---|
| Property Address | 2541 STANTON AVE. | | | | |
| City | LA HABRA | County ORANGE | | State CA | Zip Code 90631-5040 |
| Appraiser | GREGG WYNN | | | | |

# NDCdata.com

Last Updated: 08/26/2009

**Property Location**

| | | | | | |
|---|---|---|---|---|---|
| Address: | 2541 STANTON AVE | City: | LA HABRA | Zip: | 90631-5040 |
| APN#: | 018-221-06 | Use Code: | Single Family Residence | County: | Orange |
| Tract: | 2745 | Census Tract: | 11.02 | Zone: | |
| Map Page/Grid: | 708/B6 | Legal Desc: | N TR 2745 LOT 134 | | |
| Total Assessed Value: | 184,748 | Tax Amount: | 2,070.12 | | |
| Percent Improvement: | 32.88 | Tax Year: | 2008 | | |

**Current Owner Information**

| | | | |
|---|---|---|---|
| Current Owner: | CHAMBERLIN-LOMBARD,MARTHA E | Owner Address: | 2541 STANTON AVE |
| City, State: | LA HABRA CA, CA | Zip: | 90631-5040 |
| Last Transaction: | 12/29/2005 | Deed Type: | grant deed/deed of trust |
| Amount: | 0 | Document: | 0001040140 |

**Last sale Information**

| | | | |
|---|---|---|---|
| Transferred From: | | Seller Address: | |
| Sale Date: | 03/04/1997 | Prior Sale Date: | |
| Most Recent Sale Price: | 149,000 | Prior Sale Price: | |
| Document Number: | 97683 | Prior Document No.: | |
| Document Type: | quit claim | Prior Document Type: | |

**Lender Information**

| | | | |
|---|---|---|---|
| Lender: | SELLER | Full/Partial: | F |
| Loan Amount / 2nd Trust Deed: | 0 / 0 | Loan Type: | conventional |

**Physical Information**

| | | | | | |
|---|---|---|---|---|---|
| Building Area: | 1,201 | # of Bedrooms: | 3 | Lot Size: | 6,000 |
| Additional: | 0 | # of Bathrooms: | 2.00 | Year Built / Effective: | 1955 / 0 |
| Garage: | 0 | # of Stories: | | Heating: | |
| First Floor: | 0 | Total Rooms: | 6 | Cooling: | |
| Second Floor: | 0 | # of Units: | 1 | Roof Type: | |
| Third Floor: | 0 | Garage/Carport: | / | Construction/Quality: | / 0 |
| Basement Finished: | 0 | Fireplaces: | 0 | Building Shape: | |
| Basement Unfinished: | 0 | Pool/Spa: | | View: | |

**Flood Data**

| | | | | | |
|---|---|---|---|---|---|
| Panel Date: | 02/18/2004 | Comm/Panel Number: | 060224 / 0036 H | Flood Zone: | AO |

## Location Map

| Owner | LOMBARDO | | | | | | |
|---|---|---|---|---|---|---|---|
| Property Address | 2541 STANTON AVE. | | | | | | |
| City | LA HABRA | County | ORANGE | State | CA | Zip Code | 90631-5040 |
| Appraiser | GREGG WYNN | | | | | | |



# Plat Map

| Owner | LOMBARDO | | | | | |
|---|---|---|---|---|---|---|
| Property Address | 2541 STANTON AVE. | | | | | |
| City | LA HABRA | County | ORANGE | State | CA | Zip Code | 90631-5040 |
| Appraiser | GREGG WYNN | | | | | |



## Building Sketch

| Owner | LOMBARDO | | | | | |
|---|---|---|---|---|---|---|
| Property Address | 2541 STANTON AVE. | | | | | |
| City | LA HABRA | County | ORANGE | State | CA | Zip Code 90631-5040 |
| Appraiser | GREGG WYNN | | | | | |



Comments:

| AREA CALCULATIONS SUMMARY | | | |
|---|---|---|---|
| Code | Description | Net Size | Net Totals |
| GLA1 | Main Living Area | 1202.0 | 1202.0 |
| P/P | Porch | 71.5 | |
| | Cvrd. Patio | 312.0 | 383.5 |
| GAR | 2 Car Garage | 400.0 | 400.0 |
| | Net LIVABLE Area | (Rounded) | 1202 |

| LIVING AREA BREAKDOWN | | |
|---|---|---|
| Breakdown | | Subtotals |
| Main Living Area | | |
| 17.0 x 36.0 | | 612.0 |
| 20.0 x 29.5 | | 590.0 |
| 2 Items | (Rounded) | 1202 |

## Flood Map

| Owner | LOMBARDO | | | |
|---|---|---|---|---|
| Property Address | 2541 STANTON AVE. | | | |
| City | LA HABRA | County ORANGE | State CA | Zip Code 90631-5040 |
| Appraiser | GREGG WYNN | | | |



## Subject Photo's Pg. 1

| Owner | LOMBARDO | | | | |
|---|---|---|---|---|---|
| Property Address | 2541 STANTON AVE. | | | | |
| City | LA HABRA | County ORANGE | | State CA | Zip Code 90631-5040 |
| Appraiser | GREGG WYNN | | | | |



**Subject Front**

2541 STANTON AVE.

| | |
|---|---|
| Gross Living Area | 1,202 |
| Total Rooms | 5 |
| Total Bedrooms | 3 |
| Total Bathrooms | 1.75 |
| Location | AVERAGE |
| View | NONE |
| Site | 5,000 SQ. FT. |
| Quality | AVERAGE |
| Age | 54 YRS. |

**Subject Rear**



**Subject Street** 



## Subject Photo's Pg. 2

| Owner | LOMBARDO | | | | | |
|---|---|---|---|---|---|---|
| Property Address | 2541 STANTON AVE. | | | | | |
| City | LA HABRA | County | ORANGE | State CA | Zip Code | 90631-5040 |
| Appraiser | GREGG WYNN | | | | | |



East Side View



West Side View



Rear Yard View



Living Room



FAU View



Bedroom View

## Subject Photo's Pg. 3

| Owner | LOMBARDO | | | | |
|---|---|---|---|---|---|
| Property Address | 2541 STANTON AVE. | | | | |
| City | LA HABRA | County ORANGE | | State CA | Zip Code 90631-5040 |
| Appraiser | GREGG WYNN | | | | |



Bathroom View



Bathroom View



Bedroom View



Add. Bathroom View



Kitchen View

Add. Kitchen View

## Comparable Photos  1-3

| | |
|---|---|
| Owner | LOMBARDO |
| Property Address | 2541 STANTON AVE. |
| City | LA HABRA |
| Appraiser | GREGG WYNN |

County ORANGE   State CA   Zip Code 90631-5040



### Comparable 1

720 RIGSBY ST.

| | |
|---|---|
| Prox. to Subject | 0.60 miles N |
| Sales Price | 320,000 |
| Gross Living Area | 1,395 |
| Total Rooms | 6 |
| Total Bedrooms | 3 |
| Total Bathrooms | 2.00 |
| Location | AVERAGE |
| View | NONE |
| Site | 10,005 SQ. FT. |
| Quality | AVERAGE |
| Age | 53 YRS. |



### Comparable 2

2421 SIDON AVE.

| | |
|---|---|
| Prox. to Subject | 0.32 miles SE |
| Sales Price | 305,000 |
| Gross Living Area | 1,137 |
| Total Rooms | 5 |
| Total Bedrooms | 3 |
| Total Bathrooms | 2.00 |
| Location | AVERAGE |
| View | NONE |
| Site | 5,605 SQ. FT. |
| Quality | AVERAGE |
| Age | 52 YRS. |



### Comparable 3

2601 UNION AVE.

| | |
|---|---|
| Prox. to Subject | 0.20 miles S |
| Sales Price | 310,000 |
| Gross Living Area | 1,156 |
| Total Rooms | 5 |
| Total Bedrooms | 3 |
| Total Bathrooms | 2.00 |
| Location | AVERAGE |
| View | NONE |
| Site | 7,800 SQ. FT. |
| Quality | AVERAGE |
| Age | 52 YRS. |

## Comparable Photos  4-6

| | |
|---|---|
| Owner | LOMBARDO |
| Property Address | 2541 STANTON AVE. |
| City | LA HABRA | County ORANGE | State CA | Zip Code 90631-5040 |
| Appraiser | GREGG WYNN |



### Comparable 4

351 N. DEXFORD DR.

| | |
|---|---|
| Prox. to Subject | 0.38 miles NE |
| Sales Price | 310,000 |
| Gross Living Area | 1,193 |
| Total Rooms | 5 |
| Total Bedrooms | 3 |
| Total Bathrooms | 2.00 |
| Location | BACKS WASH |
| View | NONE |
| Site | 7,800 SQ. FT. |
| Quality | AVERAGE |
| Age | 54 YRS. |



### Comparable 5

541 MARIPOSA AVE.

| | |
|---|---|
| Prox. to Subject | 0.37 miles SE |
| Sales Price | 330,000 |
| Gross Living Area | 1,205 |
| Total Rooms | 6 |
| Total Bedrooms | 4 |
| Total Bathrooms | 2.00 |
| Location | AVERAGE |
| View | NONE |
| Site | 6,200 SQ. FT. |
| Quality | AVERAGE |
| Age | 53 YRS. |

### Comparable 6

Prox. to Subject
Sales Price
Gross Living Area
Total Rooms
Total Bedrooms
Total Bathrooms
Location
View
Site
Quality
Age

| In re:  Lombardo, Andrew and Martha | CHAPTER  13 |
|---|---|
| Debtor(s). | CASE NUMBER  8:09-23461-RK |

**NOTE:** When using this form to indicate service of a proposed order, **DO NOT** list any person or entity in Category I.
Proposed orders do not generate an NEF because only orders that have been entered are placed on the CM/ECF docket.

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding.  My business address is:
15760 Ventura Boulevard, Suite 1100
Encino, CA 91436

The foregoing document described **NOTICE OF MOTION AND MOTION FOR ORDERS DETERMINING VALUE OF REAL PROPERTY, EXTENT OF SECURED CLAIMS AND EXTINGUISHING THE SECOND LIEN OF AMERICAN MORTGAGE NETWORK, INC. (SERVICED BY BANCO POPULAR NORTH AMERICA); MEMORANDUM OF POINTS AND AUTHORITIES; DECLARATIONS IN SUPPORT** will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in the manner indicated below:

**I.  TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING ("NEF")** – Pursuant to controlling General Order(s) and Local Bankruptcy Rule(s) ("LBR"), the foregoing document will be served by the court via NEF and hyperlink to the document. On January 5, 2010 I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following person(s) are on the Electronic Mail Notice List to receive NEF transmission at the email address(es) indicated below:

> Amrane Cohen     efile@ch13ac.com
> Rabin J Pournazarian    rabin@pricelawgroup.com
> United States Trustee (SA)    ustpregion16.sa.ecf@usdoj.gov

☐ Service information continued on attached page

**II.  SERVED BY U.S. MAIL OR OVERNIGHT MAIL**(indicate method for each person or entity served):
On January 5, 2010 I served the following person(s) and/or entity(ies) at the last known address(es) in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States Mail, first class, postage prepaid, and/or with an overnight mail service addressed as follows. *Listing the judge here constitutes a declaration that mailing to the judge will be completed no later than 24 hours after the document is filed.*

Hon. Robert Kwan        (By U.S. Mail)
U.S. Bankruptcy Court
Ronald Reagan Federal Building
411 W. Fourth Street, Suite 5165
Santa Ana, CA 92701-4593

☒ Service information continued on attached page

**III.  SERVED BY PERSONAL DELIVERY, FACSIMILE TRANSMISSION OR EMAIL** (indicate method for each person or entity served): Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on_____ I served the following person(s) and/or entity(ies) by personal delivery, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows.  *Listing the judge here constitutes a declaration that personal delivery on the judge will be completed no later than 24 hours after the document is filed.*

☐ Service information continued on attached page

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

| January 5, 2010 | Nicholas Cheung | |
|---|---|---|
| Date | Typed Name | Signature |

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

January 2009                                                                                                    **F 9021-1.1**

| In re: Lombardo, Andrew and Martha | CHAPTER 13 |
|---|---|
| Debtor(s) | CASE NUMBER 8:09-23461-RK |

**Via U.S. Regular Mail**

## CHAPTER 13 TRUSTEE
Amrane Cohen, Chapter 13 Trustee
770 The City Drive South, Suite 3300
Orange, CA 92868

## DEBTORS
Andrew & Martha Lombardo
2541 Stanton Avenue
La Habra, CA 90631

## CREDITORS
Banco Popular
Cardmember Services
P.O. Box 691147
Orlando FL 32869-1147

Banco Popular
Legal Division
120 Broadway, 16th Floor
New York, NY 10271

American Mortgage Network, Inc.
4100 Newport Place Suite #600
Newport Beach, CA 92660

## VIA CERTIFIED MAIL
Attn: Richard Carrión, CEO
Banco Popular North America
9600 W. Bryn Mawr Ave.
Rosemont, IL 60018

Attn: Charlotte I. Catalfo, President
American Mortgage Network, Inc.
10421 Wateridge Circle
Suite 250
San Diego, CA 92121

## AGENT FOR SERVICE OF PROCESS FOR:
## BANCO POPULAR NORTH AMERICA
Vernon V. Aguirre
888 Disneyland Drive, Suite 500
Anaheim, CA 92802

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

January 2009                                                                                                              F 9021-1.1